### EDMUND L. PEMBERTON v. JOHN McRAE.

A levy expressed to be "on, as the property of J. M., 3,000 acres of land, lying on the west side of R. Creek, joining M. D. and others—pine lands," is sufficient, and would cover a tract of 5,000 acres otherwise answering the description.

But where, under such levy, the sheriff sold, and the plaintiff bought, *by the acre*, without further designation, 3,000 acres of the tract, the sale was void for uncertainty, and the land thus exposed to sale could not afterwards be identified by any action of the Court.

The purchaser at such sale is subrogated to the rights of the execution creditor, to the extent such creditor was benefited, and the execution debtor was exonerated, by the sale.

The Constitution of 1868 went into operation at least for all purposes of domestic policy, from and after its ratification, by the vote of the people, on the 24th of April, 1868: *Therefore,* where a levy on land was made between that day and June 25th, 1868, a sale under such levy could not deprive the defendant of his right of *Homestead,* under the Constitution.

RODMAN, J., *dissentiente* as to the time when the Constitution went into effect.

(*Wilson* v. *Twitty,* 3 Hawks, 33: *Shaver* v. *Shoemaker,* Phil. Eq., 327; *Owen* v. *Barksdale,* 8 Ired., 81; *Greer* v. *Rhyne,* 69 N. C. Rep., 346; *Blakeley* v. *Patrick,* 67 N. C. Rep., 40; *McKethan* v. *Terry,* 64 N. C. Rep., 25; *Edwards* v. *Kearsey,* 74 N. C. Rep., 241; *Lambert* v. *Kimmery,* 74 N. C. Rep., 348, cited and approved.)

CIVIL ACTION for recovery of land, tried at Spring Term, 1876, of the Superior Court of CUMBERLAND, before his Honor, Judge BUXTON.

The complaint describes the land as lying " on the waters of Big Rockfish, Buffalo and Juniper creeks. Beginning at a stake," (with courses, &c.,) " including two thousand acres known as the Gilchrist lands and the lands formerly owned by Neill McCraney, and all the lands formerly owned by the said McRae within said boundaries, being about three thousand acres." The plaintiff claimed under sheriff's deed as purchaser at sale under execution against the defendant;

32

said deed was dated August 9th, 1870, and recites a judg-
ment in favor of *Alex. Johnson,* to use of *T. S. Lutterloh,* v.
*Neill McFadgen, Dugald McFadgen* and *John McRae:* an exe-
cution issued and levied on the lands of said McRae and
returned to Court; a *ven. ex.* issued on the 4th of September,
1869, directing a sale of said lands to satisfy the sum of
$840.54, amount of debt, together with costs; a sale under
said *ven. ex.,* November 1st, 1869, to E. L. Pemberton as pur-
chaser, at thirty cents per acre, being $900 for the whole.

The defendant denied the plaintiff's title, on the following
grounds, among others: that the levy was void for uncer-
tainty; that the lands embraced in the description in the
complaint contained about 5,000 acres, instead of 3,000; and
the sheriff, selling by the acre, should have laid off 3,000
acres by survey, and that no homestead was allotted to him.

Evidence was offered showing that the defendant's lands
at the time of the alleged levy and sale consisted of two
tracts—the Gilchrist tract, within the boundaries of which
defendant levied, containing 4,951 acres, lying on the north
side of Big Rockfish Creek; and the McCraney tract, lying
on the other side of the creek, and containing about 400
acres. The boundaries in the sheriff's deed included both
tracts.

The plaintiff offered the executions recited in the sheriff's
deed in evidence, with the endorsements thereon. The
original *fi. fa.* was issued December 22, 1867, returnable to
Spring Term, 1868. A deputy sheriff who had the *fi. fa.* in
hand testified that on January 12, 1868, he made the follow-
ing entry in his memorandum book: "January 12th, 1868.
—This day I have levied on the property of John McRae;
3,000 acres of land, lying on the west side of Big Rockfish;
joins McDiarmid and others; pine lands—to satisfy execu-
tion in my hands for collection. Signed, R. W. Hardie,
sheriff, by D. McKennon, deputy sheriff.

He further testified that he kept the levy back "until

orders from headquarters to return papers with levies on them, without sale," and returned the execution after the general election held on the 21st, 22d and 23d of April, 1868 ; and the endorsement for levy, from the memorandum book, was then made on the execution.

The jury found a verdict " in favor of the plaintiffs, in accordance with the levy made by R. W. Hardie, sheriff, by the deputy, Daniel McKennon, for 3,000 acres, lying on the west side of Big Rockfish, joining McDiarmid and others— pine land—excluding the home place of John McRae ; the 3,000 acres to be taken from the Gilchrist land."   Therefore, the defendent moved for judgment *non obstante veredicto.* Motion overruled.   Rule for a new trial was discharged, and his Honor rendered a judgment in favor of plaintiff, and appointed two surveyors commissioners to survey and allot to the plaintiff 3,000 acres of the lands described in the pleadings and in the verdict, and report their proceedings to the next Term of the Court, to the end that upon confirmation of their report a writ of possession might issue.

Defendant thereupon appealed.

*Guthrie,* and *Wright & Ray,* for appellant.
*B. Fuller,* and *Merrimon, Fuller & Ashe,* contra.

BYNUM, J.   1. The levy is in these words :   " This day I. have levied on, as the property of John McRae, three thousand acres of land, lying on the west side of Big Rockfish,. joining McDiarmid and others, pine lands, to satisfy an execution in my hands."   Upon the authority of *Wilson* v.. *Twitty,* 3 Hawks, 44, and *Shaver* v. *Shoemaker,* Phil. Eq., 327,. we think this is a sufficient levy, and that it covers all the Gilchrist land purchased by John McRae, exclusive of his home place.   And such was the finding of the jury upon. the evidence.   Designating the land as " three thousand acres " was merely descriptive, and no more than saying,.

" said tract of land supposed to contain three thousand acres."

2. But the Gilchrist tract of land levied on contains near five thousand acres; whereas, the sheriff purported to sell, and the plaintiff to buy, only three thousand acres, *by the acre.* In no view of the case, therefore, can the plaintiff recover more acres than were thus *in numero* sold by the sheriff and purchased and paid for by the acre. What three thousand acres was bought? The bidders did and could know only that it was to be taken out of the Gilchrist tract; but that contained five thousand acres. Was the three thousand acres to be carved out of the north, south, east, west or middle part of the tract? *Id certum est quod certum reddi potest.* But here it was impossible for the sheriff to point out the land and say, " Here is the land I sold, enter upon it." The sheriff did not know what three thousand acres he was selling, nor could the purchaser know what he was buying.

Execution sales are ministerial acts. The sheriff is the officer of the law and not of the Court. The functions of the Court cease with the rendition of the judgment. The Court cannot direct what lands shall be levied on or sold, or how the sale shall be made. Nor can the Court, by any action subsequent to sale, make that act of the sheriff valid which was void when done. The three thousand acres of land exposed to sale were not identified at the time of sale, and were incapable of being located by any mere ministerial act of the sheriff. There was no rule of law that it should be cut off of this or that end of the tract, or that it lay here or lay there. The sale was, therefore, void for the uncertainty, and no action of the Court could impart to it any vitality. To uphold it would be to open the door of fraud. As the sale was void the sheriff's deed could convey no title. *Owen* v. *Barksdale,* 8 Ired., 81.

No greater effect can be given to an execution sale than to one between private parties. But it is clear that the pur-

chaser could not have had a specific performance, owing to the uncertainty of description of the thing sold. In *Grier* v. *Rhyne*, 69 N. C. Rep., 346, the contract was to convey to Rhyne and his heirs, " a certain piece of land, adjoining the lands of S. J. Sugg, M. H. Rhyne and others, being a part of the Alexander tract of land, supposed to contain 30 or 35 acres." The Alexander tract contained 70 acres. It was held by the Court that a contract of purchase of 30 or 35 acres to be taken off of a tract of 70 acres, without saying *where* it was to be taken off, was so vague and indefinite that it could not be specifically performed ; and the sale of the tract under an execution junior to the bond for title for the thirty acres passed the title of the whole tract to the purchaser. So in *Blakely* v. *Patrick*, 67 N. C. Rep., 40, there was a mortgage by a buggy maker of ten new buggies, without delivery of possession, he having more than ten on hand at the time. The mortgage was held ineffectual to pass title to any particular buggies or to any interest in the buggies on hand ; and it was also held that the mortgagee could not maintain an action for the recovery of ten new buggies in the possession of the mortgagor.

3. By the Constitution every homestead of a resident of this State shall be exempt from sale under an execution for debt. It is decided that no levy of an execution subsequent to the adoption of the Constitution can divest the defendant in the execution of his right of homestead, but that executions levied prior thereto do divest the right. *McKethan* v. *Terry*, 64 N. C. Rep., 25 ; *Edwards* v. *Kearsey*, 74 N. C. Rep., 241; *Lambert* v. *Kimmery*, 74 N. C. Rep., 348.

The levy here was made shortly after April the 24th, 1868, the day when the Constitution was ratified by the vote of the people, but before the 25th of June, 1868, when the Constitution so adopted by the people of the State was approved by the Act of Congress. It is affirmed by the plaintiff that the Constitution went into effect only from and af-

ter its approval by Congress, which approval was subsequent to the levy, and it is insisted by the defendant that it took effect from and after its ratification by the people, which was on the 24th of April, 1868; and that no levy posterior to that time could divest him of his homestead.

We do not propose to enter into a critical examination of the question. The times and occasion which produced our present Constitution were anomolous. As they were without precedent in American history, so there are no pre-existting, unerring guides by which the political actions of that era are to be determined. It might not be necessary to decide at what particular moment of time the Constitution of 1868 went into effect *for all purposes.* For the purpose, however, of giving effect to the benignant provision in behalf of poor debtors, we are of opinion that it took effect from and after the day of its adoption and ratification by the vote of the people of the State. The homestead provision is a subject of domestic policy only, and it in nowise affects our relations with the Union or a Republican form of government for which purpose alone was the power of approving the Constitution revised and exercised by Congress in the rehabilitation of the Southern State governments. The act of Congress providing for the reorganization of the State governments, nowhere countenances the idea that the State Constitutions for State purposes do not derive their existence, their beginning and functions, from the action of the people alone. It would be political heresy to hold otherwise. Accordingly Congress, far from denying the right of the people to frame and put into operation their State Constitutions by the act in question, only required the performance of certain conditions before the States should be entitled to representation in the Federal Congress.

It was competent for the Convention which framed the Constitution of 1868 to have said at what time it should go into effect, but it was not competent for Congress to say so,

except as to its provisions affecting the relations of the State to the general gevernment, as a member of the Union. We must, then, look to our own Constitution, and the ordinance submitting it the vote of the people, to ascertain when it went into operation. If nothing then appears to the contrary, (and nothing does so appear) according to every principle of popular sovereignty, it took effect from and after its ratification by the people. It may be, that after the Constitution was adopted by the people, and prior to its approval by Congress, acts were done, both judicial and legislative, inconsistent with the idea that it took effect before its approval by Congress. If such is the fact, it only goes to show, what all must admit, that these departments of the State government may and do commit errors, but it does show, or tend to show, that the Constitution did not *per se,* of its own inherent force, take effect potentially from the date of its ratification by the people. We may not view with severe eyes all the judicial and legislative acts done in that dark and perplexing transition from a provisional government to the approval of the new Constitution by the Congress of the United States. In the general anxiety for the full restoration of our federal relation to the Union, we sometimes overlooked the ancient landmarks which separated the rights of the States from the powers of Congress. But a clear distinction is to be drawn between rights conferred and established by the Constitution, and the machinery, officers and agents by which these rights are to be administered. The right of homestead, for instance, did not the less exist, upon the adoption of the Constitution, because, at that moment, the officers of the law, by whom the right was to be enforced, had not been inducted into office. And so with regard to other officers of the State, who are directed by the Constitution not to assume their functions until the approval of the Constitution by Congress, or in some cases, ten, and in others fifteen days thereafter. Art. III,

sec. 1; Art. VII, sec 10; Art. II, sec. 29. That the Constitution took effect from and after its ratification by the vote of the people, and not from its approval by Congress, is expressly decided in the case of *Campbell* v. *Fields*, 35 Texas, 751.

4. The plaintiff, however, has paid out his money for the land exposed to sale in the manner described, and this money has been applied in satisfaction of the execution. He is therefore substituted to the rights of the execution creditor, as upon a failure of title in the defendant to the thing sold, to the extent that the execution creditor has been benefited, and the execution debtor has been exonerated, by the sale. The case would seem to•fall clearly within the equity, if not the words of the statute. Rev. Code, chap. 45, sec. 27 ; Adams' Eq., 269, and notes.

The sum of $900, thus paid for the land by the purchaser, constitutes a lien or incumbrance upon the land levied on by the sheriff, and must be reimbursed to the plaintiff with interest, by a sale of the land levied on, remaining to the defendant, after the allotment of his homestead thereout. In the allotment of the homestead, the defendant is first entitled to his home place, next, to the Mc-Craney tract, and lastly, if any more is required to make up the homestead, it will be taken out of the Gilchrist land which has been levied on. The remainder of the Gilchrist land, by an order of the Court below, will be sold, and the purchase money will be applied, first to the payment of $900 and interest, to the plaintiff, and the residue, if any, will be paid to the defendant. If the land so to be sold will not realize enough to reimburse the plaintiff, the deficiency must be his loss.

The judgment is reversed, and the case remanded, to be proceeded in in accordance with this opinion.

PER CURIAM.        Judgment reversed and case remanded.