This is an action brought by plaintiff, as a resident and taxpayer of the city of Durham, to enjoin the issue of bonds for the purchase, or construction, and maintenance of a system of water-works by said city for the purpose of supplying its inhabitants with water. The act of the General Assembly authorizing the issue of bonds for the purpose aforesaid was ratified on 9 January, 1917. The plaintiff alleges that the act is void because it was passed after the amendments to the Constitution of the State, which were adopted by the people at the election held on Tuesday, 7 November, 1916, had become of full force and effect, the contention being that the amendments took effect on the day of their adoption by the people, and when adopted, and that, this being so, the Legislature was forbidden to pass the act authorizing the issue of bonds by the city of Durham for the purposes therein set forth. There are other grounds stated upon which the appellee, city of Durham, contends that the act is a valid exercise of legislative power, but, as we will decide the case upon the single ground that the amendments were not in force at the time the act in question was passed, it is unnecessary to consider the others, and they are, perhaps, too important to be examined and passed upon before they are so directly and squarely presented that their decision will be absolutely essential. *Page 725 
The Constitution of the State provides in Article XIII, sec. 2: "No part of the Constitution of this State shall be altered unless a bill to alter the same shall have been agreed to by three-fifths of each house of the General Assembly, and the amendment or amendments so agreed to shall be submitted at the next general election to the qualified voters of the whole State, in such a manner as may be prescribed by law. And in the event of their adoption by a majority of the votes cast, such amendment or amendments shall become a part of the Constitution of the State."
Under this provision of the Constitution the General Assembly, (670) at the Session of 1915, and on 9 March of that year, passed, by a three-fifths vote of each house, an act to submit certain alterations or amendments of the Constitution to the people for adoption, which, in substance, at least, if not literally, are as follows:
"SEC. 1. By adding at the end of Article II a new section, to wit:
"SEC. 29. The General Assembly shall not pass any local, private, or special act or resolution:
"Relating to the establishment of courts inferior to the Superior Court; relating to the appointment of justices of the peace; relating to health, sanitation, and abatement of nuisances; changing the names of cities, towns and townships; authorizing the laying out, opening, altering, maintaining, or discontinuing of highways, streets, or alleys; relating to ferries or bridges; relating to nonnavigable streams; relating to cemeteries; relating to the pay of jurors; erecting new townships, or changing township lines, or establishing or changing the lines of school districts; remitting fines, penalties, and forfeitures, or refunding moneys legally paid into the public treasury; regulating labor, trade, mining, or manufacturing; extending the time for the assessment or collection of taxes or otherwise relieving any collector of taxes from the due performance of his official duties or his sureties from liability; giving effect to informal wills and deeds;
"Nor shall the General Assembly enact any such local, private, or special act by the partial repeal of a general law, but the General Assembly may at any time repeal local, private, or special laws enacted by it."
The above was the first amendment proposed for adoption by the people.
The second of the amendments provided for the passage of general laws for the selection of emergency judges of the Superior Courts, and the third amendment for the enactment of general laws concerning chartering and organizing all corporations, and for amending, extending, and forfeiting of all charters, with specified exceptions; and for altering or repealing such general laws, or special acts, where permitted at any time; and further, by the amendment, the Legislature was forbidden to *Page 726 
create corporations, or extend, alter, or amend their charters by special legislation, except in the cases enumerated therein.
The fourth of these amendments was as follows:
"It shall be the duty of the Legislature to provide by general laws for the organization of cities, towns, and incorporated villages, and to restrict their power of taxation, assessment, borrowing money, (671) contracting debts, and loaning their credit, so as to prevent abuses in assessments, and in contracting debts by such municipal corporations."
The act further provides, omitting immaterial parts:
SEC. 2. That the several amendments to the Constitution hereinbefore set forth as numbered from 1 to 4, inclusive, respectively, shall be and are hereby submitted to the qualified voters of the whole State at the next general election as separate amendments to the Constitution, all amendments proposed under each number respectively being regarded as one amendment.
SEC. 3. That the said several proposed amendments shall be designated on one ballot by their appropriate article and section numbers, and also by their appropriate descriptive titles, and as so designated on said ballot shall be consecutively numbered in the manner and form hereinafter set forth.
SEC. 6. That, except as herein provided, the election upon the several amendments herein designated shall be conducted in the same manner and under the same rules and regulations as provided under the laws governing general elections and in force at the time of said general election at which these amendments shall be submitted. The said election shall be held and the votes returned, compared, counted, and canvassed, and the result announced, under the same rules and regulations as are in force at the general election in the year 1916 for returning, comparing, counting, and canvassing the votes for Governor; and if the majority of the votes cast be in favor of any amendment, it shall be the duty of the Governor of the State to certify said amendment under the seal of the State to the Secretary of State, who shall enroll the said amendment so certified among the permanent records of his office.
SEC. 7. That at least six months prior to the said election the Secretary of State shall cause to be printed not less than 500,000 copies of the amendments to be submitted at the said election, in one pamphlet, together with a copy of the Constitution as it now stands, and a form of ballot, including number, title, description, and instructions to voters as shown hereinbefore; and that at least 1,000 of said pamphlets shall be forwarded within thirty days after publication to the register of deeds of each county in the State for distribution; and that the remainder of *Page 727 
said pamphlets shall be distributed under the supervision of the Governor and Secretary of State.
SEC. 8. Each amendment on which the number of affirmative votes shall exceed the number of negative votes shall become a part of the Constitution; and any amendment so adopted shall take effect on the second Wednesday after the first Monday in January in the year 1917. Any provision of the amendments passed and submitted by this General Assembly and so adopted by the qualified voters (672) inconsistent with or in conflict with any provision of the present Constitution shall be held to prevail.
SEC. 9. All laws and clauses of laws in conflict with the provisions of this act are hereby repealed.
SEC. 10. This act shall be in force from and after its ratification.
The amendments were submitted, as required by the act, at the general election in November, 1916, and all of them were adopted by the people.
The rules and regulations of the general election law of the State in force in November, 1916, for returning, comparing, counting, and canvassing the votes for Governor provide that the Board of State Canvassers shall estimate the votes cast for officers of the Executive Department from the abstracts returned to the Secretary of State, and shall publish a statement of the result, but only for public information, and it shall not have the effect of determining who has been elected to the particular office of that department of the Government, but the election of such officer shall be ascertained and declared according to section 3 of Article III of the Constitution, which provides that the returns for Governor and other executive officers shall be sealed up and transmitted to the Speaker of the House of Representatives, who shall open and publish the same in the presence of a majority of the members of both Houses of the General Assembly, and the person having the highest number of votes shall be declared to have been duly elected, with a provision for settling contested elections. The statute, Revisal of 1905, sec. 5326, as subsequently amended, enacts the provisions as contained in Article III, sec. 32, of the Constitution, and provides, further, that on the first Tuesday after the convening of the General Assembly, and after an election of executive and certain other officers mentioned, the Senate and House shall meet in joint session in the hall of the House of Representatives, at 11 o'clock in the forenoon, when and where the Speaker shall proceed, in compliance with the Constitution, to open and publish the vote for Governor, and said other officers, cast at the last preceding election, and the result thereof. Whereupon the Governor shall take the oath of office. *Page 728 
This method of ascertaining and declaring the result of the vote for Governor was exactly pursued in respect to that of determining and declaring the passage of the amendments, as provided by section 6 of the act under which the amendments were submitted to the people for ratification or rejection, and the said result was duly certified by the President of the Senate and Speaker of the House of Representatives under their hands, the proceedings for ascertaining the result of (673) the vote upon the amendments having taken place in the hall of the House of Representatives on Tuesday, 9 January, 1917, the Legislature having convened on the Wednesday before that date, that is, on 3 January, 1917. The amendments, therefore, were duly and regularly adopted according to the Constitution and the statute of 1915 enacted in pursuance thereof.
The particular act now being considered is attacked upon several grounds, but they all depend upon the question whether the new amendments took effect on 7 November, 1916, or on Wednesday, 10 January, 1917. It is taken for granted, and conceded in the pleadings and case, that if the bonds will not be void on the special grounds stated, then they are valid, there being no other objection to their validity. We, therefore, have before us in this case for decision the clear-cut question, as to when the recent constitutional amendments became of full force and effect.
The Court was of the opinion, and so decided, that the amendments were not in force until Wednesday, 10 January, 1917, and as the Durham statutes were passed before that day, viz., on 9 January, 1917, they are valid enactments. He also upheld them on other grounds which we need not state here.
Judgment was entered for the defendant, refusing the injunction, and the plaintiff appealed.
There are several cases now before us, on appeal to this Court, which present the same question as the one which counsel agree as the decisive one in this record. They have been argued orally before us by counsel. Messrs. A. G. Mangum for defendant in Rankin v. Gaston County, post, 683, and J. L. Morehead for defendant in this case, who contended that the amendments did not take effect until 10 January, 1917, and by Mr. John G. Carpenter for the plaintiff in the Rankin case, who with equal confidence asserted that they were of full force and effect on 7 November, 1916. These arguments were able and exhaustive of the subject, and have aided us greatly in coming to a satisfactory conclusion. The question has also been *Page 729 
argued in briefs by other counsel, Mr. W. G. Bramham in the Durham case, Messrs. Manning Kitchin and Charles M. Malone for defendant, and Mr. J. F. Henderson for the plaintiff, in Highway Commission v.Malone, post, 685, by Messrs. Squires Whisnant for defendant, and Mr. J. T. Pritchett for plaintiff, in Richardson v. CaldwellCounty, post, 685. Messrs. Winston Biggs, at their request, (674) were permitted to appear as amici curiae, as they represented other parties interested in this question, and they have also filed a brief. The arguments, pro and con, have been of a high order, and worthy of the important and far-reaching question involved. We are informed that there are between four and five hundred acts passed between 3 January, 1917, and 10 January, 1917, depending for their validity upon our decision. Having carefully examined the case, with the aid of the oral arguments and briefs, we are now ready to state our decision and the reasons which have led us to it.
No one can read Article XIII, sec. 2, of our Constitution without concluding at once that no alteration is permitted by it without the joint action of the Legislature and the people. Amendment of the organic law of the State does not depend upon a popular vote alone, but before the people have a right to express their choice as to whether or not there shall be a change the Legislature must by a three-fifths vote of each house thereof consent and provide that the amendment shall be submitted to the people "in such manner as may be prescribed by law." The Constitution itself does not declare when, or at what particular time, an amendment submitted to the voters and adopted by them shall take effect. It does provide, it is true, that in the event of adoption the amendment shall become a part of the Constitution; and if this was all that is said in that instrument, it might well be argued that the amendment would take effect at once, or at the very time of its adoption, which, as contended by the plaintiff in this case, and those in the other cases before us who concur with him, must mean at the time when all the votes have been cast, and before they are counted. They can't say that it means "when all the votes have been cast and have been counted and the results ascertained and declared by the poll-holders, or the local board of elections, for the latter procedure will consume time, as returns may be delayed and other hindrances encountered, which may postpone the final count for some considerable time, and it may be added, if the operation of the amendment can be postponed until the final count, when there is delay, so that the amendment will not take effect for some time after the day of election, why may not the day when the amendment takes effect be postponed until the two houses of the Legislature have finally passed upon the returns made to the Secretary of State? It would seem that any argument which would sustain the former view should be *Page 730 
of equal weight in support of the latter. So the question is, whether the amendments took effect when the polls were closed in the evening of 7 November, 1916, or on the day fixed for that event by the act (675) providing for a vote of the people upon them. If the Legislature must take part in authorizing the submission of the question to the people, why can't this be done in a modified rather than an absolute form? Three-fifths of each house of the General Assembly may be very willing to submit an amendment to a vote of the people if it is to take effect at a certain time named in their bill, when they would not be willing to do so if the amendment must take effect on the day of the election, provided a majority of the voters have favored it. Therefore it is that the Constitution provides not only for a three-fifths vote of each house, but also that the submission should take place only "in such manner as may be prescribed by law," and this means, no more or less, than that the Legislature may have complete control of the submission, which is not confined to the mere act of voting, but embraces all measures necessary to put in force the will of the people as expressed at the ballot box. The power given to the General Assembly to submit amendments to the people is a general and unrestricted one, in the sense that they may, without any limitation, prescribe the method by which this shall be done — in other words, the procedure throughout, and from beginning to end. The time when the amendments should become effective is as much a part of the submission as the amendments themselves. No one contends that if the provision as to the time the amendments should take effect had been submitted as a part of the amendments and voted on by the people, it would be operative; but was this formality necessary when the people have virtually voted for this clause of the act? Ample provision was made for the widest dissemination among the people of full knowledge as to the provisions of the entire act, as appears in these cases, and by the act itself. The Legislature provided for the distribution among the people of 500,000 copies of this act and the Constitution. The people well knew, when they voted for the amendments, that they were not to take effect until 10 January, 1917. The terms of the amendments were not set out in full in the official ballot, but only the briefest synopsis of them, and it was impossible for the people to know or understand what was submitted to them unless they referred to the act for the information. How could they know how it was proposed to restrict local, private, and special legislation, or to prevent delays in trials by providing emergency judges, or to grant special charters to corporations, or to grant such charters to towns, cities, and villages, without reading the act of the Legislature? So that when they voted for the amendments it was necessarily an approval of the time fixed for their taking effect. *Page 731 
The position that when the people voted for the amendments they thereby assented to the provision that they should take effect on 10 January, 1917, is strongly supported by the recent decision of (676) this Court in Keith v. Lockhart, 171 N.C. 451. In that case the question of "stock law" or "no stock law" was submitted to the people. The act required that if a majority voted against a stock law, a certain tax should be levied to build a fence around the county; but this provision of the statute was not mentioned in the submission, nor did it in any way appear on the ballots. The Court held that a majority vote against the stock law was, necessarily, a vote in favor of the fence and the tax, although the latter was not submitted as a separate and distinct proposition to be voted on by the people, and there was no reference to it on the ballots. That case was followed and approved inFaison v. Comrs., 171 N.C. 411. We said in the Faison case: "At the present term we have held, in Keith v. Lockhart, post, 451, that the building of a fence around a county under the circumstances as they appear in this case is not a necessary expense, and a vote of the people is required to raise the means of taxation for paying the cost of it, but that a vote by the people of the county in favor of free range, or, as it is termed in the statute, `no stock law,' under the provisions of the statute is equivalent to a vote for the tax, and confers authority to levy the tax." There was a dissenting opinion in Keith's case, but it did not extend to or affect that part of the decision, for, in respect to it, the Court, as appears in the report of the cases, was entirely unanimous. It seems to us that those cases are decisive of the question we now have under consideration, or, at least, are very closely analogous to this case, and sufficiently so to have great weight with us.
But the rule of reason favors the construction of the Constitution that the Legislature could fix the time for the amendments to take effect. Can it be supposed that it was intended to change the organic law by a mere vote of the people, the final result of which could not be officially known until declared by the two houses in the manner prescribed by the Constitution? During the long period between the election and the assembling of the Legislature we might be under the operation of an important amendment, affecting vitally our interests, without even knowing it, if the amendments take effect automatically when the ballots have all been cast. It was to prevent such a result that the Legislature was empowered to prescribe completely the method of submission to the people, including the power to appoint the time when the amendments, if adopted, should become effective as a part of the Constitution. The form of the submission was substantially that the Legislature had passed the amendments to take effect on 10 January, 1917, and referred them to the people for their adoption in this way. *Page 732 
(677) But it is useless to advance further argument in favor of the proposition, as there is abundant authority to sustain the contention of the defendant in this case that the amendments did not take effect until 10 January, 1917.
One of the first rules in construing constitutions, and it applies to all written instruments, is to ascertain the intention of the people in adopting it. 6 Am. and Eng. Enc., 921, Ann. cases, 1915-B, p. 381. There can be no question, we think, as to what was the intention of the framers and the people in respect to this provision.
In Real v. People, 42 N.Y. 270, it appeared that several amendments to the Constitution were submitted to the people, and among them one concerning the judiciary and another as to the time (1 January, 1870) from which the amended Constitution should take effect. All the amendments were rejected except the one concerning the judiciary, and it was held that, notwithstanding the rejection of the amendment as to the time, and all the others, the judiciary amendment took effect from and after 1 January, 1869. The Court said: "By the 5th section of the 14th article it was provided that this Constitution shall be in force from and including the 1st day of January next after its adoption by the people. This section related to the entire proposed Constitution, the judiciary article included; and, had the proposed Constitution been adopted, would, of course, have determined the time when all its provisions would have taken effect. But that portion containing this provision was rejected, and it is, therefore, insisted by the counsel for the plaintiff that it never had any operation. But its insertion shows clearly that the convention intended that no part of the proposed Constitution should take effect until that time. The fact that the Legislature submitted the judiciary article to a separate vote could not affect this intention. Those voting for the proposed Constitution, or any part of it, saw the time therein limited for its taking effect, and must have voted for it, or any part of it, in reference to such time. To suppose that those voting for the judiciary article and against the residue of the instrument intended that the former should take effect, if adopted, upon the announcement of the result, would be absurd. All must have understood that such parts, if any, as were adopted should take effect at the time prescribed, irrespective of what might be rejected. This manifest intention of the framers of the article, and of those adopting it, controls the time of its taking effect. That time was 1 January, 1870, as to the provision in question." That Court, composed of some of the ablest and most learned of the judges, one afterwards a justice of the Supreme Court of the United States, unanimously held, without the slightest hesitation or doubt, that even when the amendment as to time (678) was rejected, the clear intention of the Legislature which passed *Page 733 
the act of submission, and of the people, was that the amendments should take effect 1 January, 1870, and that this intent could be gathered from the statute and the vote of the people, including the manner of submission; and this shows that the case is directly in point.
It should be added that we have carefully examined the New York Constitution, and find that its language in regard to amendments is almost identical with ours, if not literally so. The provision is that an amendment shall be submitted "at the time and in the manner prescribed" by the Legislature, and, when adopted, shall become a part of the Constitution. This provision was enacted in 1846 or earlier, and was in force, it seems, when Real's case was decided. See American Constitutions (Ed. of 1894), vol. 2, p. 45 (Const. of New York, Art. XIII, sec. 1). Another case to the same effect as Real's case is S. v. Kyle, 166 Mo., 287, where the Constitution was worded like ours, viz., that amendments should be submitted "in such manner as the General Assembly may provide," and that if a majority vote for the amendments "They shall be valid and binding to all intents and purposes as a part of the Constitution." It also provided for a canvass of the vote just as ours does, and it was held that the amendments did not take effect until the vote was canvassed and the result ascertained. The Court, quoting from and approving Real v. People, supra, said: "The result of the election showing the adoption of this article by a majority of the votes cast, must, within the meaning of the rule, be deemed its passage. The canvass of the votes cast by the various boards of canvassers as required by law, and announcing the result and certifying the same as required by law, is as much a part of the election as the casting of the votes by the electors. The election is not deemed complete until the result was declared by the canvassers as required by law. When the result was declared by the State Board of Canvassers, the article was adopted and, under the rule, became operative at once, unless from the nature of the provisions themselves, or those of some other law, it appears that it was to take effect at some future period, or unless it clearly appears that the intention of the framers of the article, and of those by whom it was adopted, was that it should not take effect until some definite future time."
Of like import is the case of Sewell v. State, 15 Tex. App., 56, where, by statute, a canvass of the vote was required to be made on the fortieth day after the election, no time being fixed by the Constitution for amendments to take effect. It was held that the amendments adopted by the people at the election became operative when the returns were canvassed and the result declared, as this was the clear implication (679) from the fact that a canvass of the vote was required. The same was decided in Ellis v. Cerburne, 35 S.W. 495. And the case of *Page 734 City of Duluth v. Duluth St. Rwy. Co., 60 Minn. 178, is equally strong as an authority for the same position. The Constitution of that State provided that if it shall appear that a majority of the votes were cast for the amendment, "it shall be valid, to all intents and purposes, as a part of the Constitution," with a provision for ascertaining the result of the election "in a manner to be provided by law." The Legislature provided for a canvass of the vote and a proclamation of the result, and it was held that the amendment did not take effect, at least until the result was ascertained by a canvass of the vote.
In S. v. Kyle, supra, the Court further said: "Now, in the absence of a canvass of the vote upon these amendments, courts having criminal jurisdiction had no means of ascertaining the result of the vote of the people upon them, whether adopted or not, and were simply groping in the dark as to whether or not felonies might be prosecuted by information as well as by indictment, or whether, as the Constitution was before the amendment, grand juries were usually convened at each regular term, or, under the amendment, they could only be convened except by an order of a judge of a court having the power to try and determine felonies, and we are satisfied that in order to avoid any embarrassment or complications that might arise under such circumstances, the Legislature intended that the amendments should take effect and be operative from the time of the canvass of the vote therein."
In Farrar v. Street, etc., Ry. Co., 149 Mo. App. 188, it is said: "The general rule that constitutions and constitutional amendments take effect upon their ratification by the people, unless otherwise provided in the instrument itself or the resolutions submitting them, applies to sovereign States possessing within themselves the power to make and unmake constitutions." (Italics ours.) The text-writers are equally pronounced in stating this principle. "If by provision of statute the vote on a constitutional amendment is regulated by the general election law of the State and, by such law, election returns are to be canvassed by the Secretary of State and the result certified by his to the Executive, to be proclaimed by him, a constitutional amendment that has been adopted by the necessary vote shall not take effect until such vote is canvassed." 8 Cyc., 745. "When from all of the several proposed amendments it clearly appeared that it was the intention of the Legislature, and was so understood by the voters, that such amendments should not take effect the one receiving by sanction of the votes will not take effect (680) until such future date, though in itself it contained no such provision." 6 Am. and Eng. Enc., 910. In none of the cases cited by those who contend that the amendments were in force 7 November, 1916, was there any day fixed in the act submitting the amendments, for *Page 735 
them to take effect, and the language of the Constitution therein construed was substantially different from that in our Constitution. In Seneca MiningCo., 82 Mich. 573, amendments by prior provision of the Constitution took effect on January 1st after the election in the fall. The time of the election was changed to the spring, and the Court held, that the amendments took effect at once, as the clear intention was that the next Legislature pass laws to meet the object to be accomplished by the change, and if this was not so, there was no reason for making the change. There was nothing inScholl v. Bowman, 62 Ill. 321, to take the case out of the usual rule. No time was fixed by the Legislature for the operation of the articles separately submitted. The Court in Boston and Colo. S. Co. v. Elder, 20 Col. (77 Pac. Rep., 258), merely held that the amendment took effect on the date of the Governor's proclamation, and the same may be said of City andCounty of Denver v. Adams Co., 33 Col., 11-12. In the Florida case
(34 Fla. 500), which was an advisory opinion of the Court to the Governor of that State, there was nothing in the Constitution or the statute to take the case out of the ordinary rule, and the Court so declared.
We come now to the case of S. v. Campbell, 115 N.E. Rep., 29, so much relied on by counsel to sustain the position that our amendments took effect from 7 November, 1916. It is not analogous to this case, as the language of the Constitution there construed is materially different from that now under consideration. It belongs to the class of cases we already have distinguished.
The Constitution of Ohio provides absolutely that any amendment should take effect, or become a part of the Constitution, at the time of its adoption. The Court takes pains to state that, in this respect, it differs from other State constitutions where language is used that does authorize the legislatures, in the act of submission, to prescribe the time when the Constitution, or amendments thereto, shall take effect; and our Constitution is one of this kind. The only discretion given to the General Assembly of Ohio was to determine whether amendments should be submitted at a general or a special election. We rather think that S. v. Campbell,supra, when properly considered, in all its bearings, is an authority sustaining our conclusion.
The case of Pemberton v. McRae, 75 N.C. 502, would seem to be an authority for the position that the legislative body submitting the amendments may prescribe the time when they shall take effect. (681) But the question there was whether, in the absence of any time being fixed in the ordinance of submission, the Constitution of 1868 took effect at the time of its adoption by the people, or when Congress approved it, and the former date was accepted as the time, there being nothing else to prevent the application of the ordinary rule. We have *Page 736 
not overlooked S. v. Am. Sugar Ref. Co., 68 So. Rep. (La.), 742, where the Court said: "When the people, acting under a proper resolution of the Legislature, vote in favor of calling a convention, they are presumed to ratify the terms of the call which thereby become the basis of the authority delegated to the convention." If the Legislature, in a call for a constitutional convention, can limit the subject which the convention may consider, it would seem to follow that it may, a fortiori, prescribe the time when a constitutional amendment submitted by it shall take effect.
It is a part of our legislative history that the act calling the Convention of 1835 imposed certain restrictions upon the subjects to be considered, which were tacitly assented to by its delegates under the lead and advice of that eminent statesman and jurist, Judge William Gaston. The act of 1874-5, calling the Convention of 1875, also limited the subjects to be acted on, to which that body gave its tacit consent. And the act of 1913, submitting amendments, which were identical with some of those now under consideration, fixed the date for them to take effect, just as has been done in the present case.
The last Legislature, it was said in the argument, had passed four hundred and two (402) acts prior to 10 January, 1917, which will be affected, one way or another, by the date on which the amendments took effect. We recite these facts to show that the legislative department of the Government has given a practical interpretation to this clause of the Constitution for many years, and while we are not bound by it, but may construe it according to our notion of what was intended, the legislative view as to what it means will not be disregarded, but allowed its proper weight. In Hedgecock v. Davis, 64 N.C. 650, Chief JusticePearson, in referring to the meaning which the Legislature had, in a single instance, given to a section of the Constitution, said: "But suppose the matter to be doubtful; the General Assembly has put a construction upon this section which the Court does not feel at liberty to depart from, unless it be clearly wrong." Where the practical construction is opposed to the clear meaning, it will not be adopted, Stuart v.Wrightson, 56 N.J. L., 126, though some courts, even in such a case, have given preference to the legislative view. Johnson v. Joliet, etc., R. R. Co., 23 Ill. 202; Bingham v. Miller, 17 Ohio, 446; Rogers(682) v. Goodwin, 2 Mass. 475; Stuart v. Laird, 1 Cranch (U.S.), 299. But this course may be considered as of doubtful wisdom or expediency. It is fairly well settled, however, that "the legislative construction is, under certain circumstances, of no little importance in constitutional exegesis." 6 Am. and Eng. Enc., 932; West River Bridge v.Dix, 6 How. (U.S.), 507; Cooley v. Board of Wardens, 12 How. (U.S.), 299; Moers v. Reading, 21 Pa. St., 1888; Burgess v. Pue, 2 Gill (Ind.), *Page 737 
11; Faribault v. Misener, 20 Minn. 396; Jackson v. Washington County,34 Neb. 680. Chief Justice Elliott said substantially in Hovey v. State,119 Ind. 640, that while the Court was far from asserting that the plain provisions of the Constitution may be broken down or overleaped by practical exposition, it did assert that where there are provisions not entirely clear and free from doubt, such an exposition is of great force, and it was there thought to be controlling. It is not necessary, in this case that we should go so far in our view, though we do not mean to discredit the opinion so ably expressed and fortified by that Court, but merely to keep within the bounds of the case in hand. The construction of the section now being considered has been uniform, and, in such a case, we pay great respect and deference to the opinion as to its meaning held and so expressed by the other departments of the Government, and in doubtful cases will follow it, unless plainly the wrong one; and this has been the usual course pursued by the courts. 8 Cyc., 736, and cases in notes. Cohensv. Virginia, 6 Wheat. (U.S.), 418, where Chief Justice Marshall said that great weight has always been attached, and very rightly so, to contemporaneous exposition by other departments.
The rule generally accepted is well stated in 8 Cyc., 736, as follows: "Contemporaneous and practical construction of constitutional provisions by the executive and legislative departments of the Government will be considered by the courts in passing upon constitutional questions; and while they are not bound by such constructions, except as to questions of a discretionary character, they often yield to them as matters of policy; and in doubtful cases will follow such construction as of course, unless they are clearly erroneous." In City v. Adams Co., 33 Cal. 1, the Court said that a contemporaneous legislative construction of a constitution, while not conclusive upon the courts, is, nevertheless, quite persuasive. It was held in Gill v. Comrs., 160 N.C. 176: "The construction of a statute by the officers charged with executing it is entitled to great consideration, especially if made by the highest officer in the executive department, or acted upon for many years, and should not be disregarded unless clearly erroneous." See, also, Board, etc., of Winston v. Board, etc., of ForsythCounty, 163 N.C. 404.
We are, therefore, constrained to hold, not only by clear (683) precedent, but by a fair and reasonable construction of the Constitution, without the aid of it, and also by a proper yielding to the contemporaneous and continuous interpretation of the Legislature and the executive department of the State, that when the amendments were submitted to the people last November the Legislature intended, and the people understood, that the question to be considered by the voters was not merely whether they should be adopted and without qualification, but also whether, if adopted, they should take effect on 10 January, 1917 *Page 738 
— the time when they should take effect being an essential and integral part of the question submitted to the voters. 6 Am. and Eng. Enc. (2 Ed.), p. 910.
We may say generally, before closing this opinion, that the decisions which have been cited to show that the amendments took effect on the day of election, either when the polls were closed or when the vote was then counted, refer to cases where there was nothing in the Constitution and act of submission to control the time of operation. Some of the expressions by the courts, even in these cases, give decided color to the belief that in a case of this kind the decision would have been different, and would have accorded with the views we have stated and the conclusion we have reached.
The result is that there was no error in the judgment of the court.
Affirmed.
Cited: Rankin v. Gaston County, 173 N.C. 684; Richardson v. Comrs. ofCaldwell, 173 N.C. 685; Woodall v. Highway Com., 176 N.C. 388; Freeman v.Lide, 176 N.C. 435; Comrs. of Wilkes v. Pruden, 178 N.C. 398; Riddle v.Cumberland, 180 N.C. 327; Watts v. Turnpike Co., 181 N.C. 134; In reHarris, 183 N.C. 634; Day v. Comrs., 191 N.C. 782; Freeman v. Board ofElections, 217 N.C. 69; Valentine v. Gill, Comr. of Revenue, 223 N.C. 399;S. v. Emery, 224 N.C. 583; Perry v. Stancil, 237 N.C. 448.