## THE STATE v. KYLE, Appellant.

### In Banc, December 21, 1901.

1. **Indictment and Information.** Indictment and information are now concurrent remedies.

2. **Amendment to Constitution:** TIME OF TAKING EFFECT. The amendment to the Constitution adopted November 8, 1900, making indictment and information concurrent remedies in prosecution for felonies, took effect and was operative from the time of the canvass of the vote thereon by the Secretary of State, and not before.

3. ————: SELF-ENFORCING. Said constitutional amendment, pertaining to criminal procedure and being prohibitory in character, is self-enforcing without the aid of legislation.

4. ————: INDICTMENT AND INFORMATION: MEANING. The terms information and indictment as used in that constitutional amendment are to be understood in their common-law sense—information meaning a criminal charge presented by the Attorney-General or the prosecuting attorney under his official oath.

5. ————: ————: EX POST FACTO LAW. Said amendment, being a change only in the mode of procedure, is not an *ex post facto* law. So that the prosecuting attorney could, after it became operative, begin a prosecution against defendant by information for a felony committed between the time the amendment was adopted by the people and the time the vote thereon was canvassed by the Secretary of State.

State v. Kyle.

6. ——— : ——— : FILING: LEAVE OF COURT. It is not necessary for a prosecuting attorney, in filing informations in felony cases, to ask leave of court to do so.

7. ——— : ——— : ——— : IN VACATION. Nor is such information invalid because filed in vacation of court.

Appeal from Moniteau Circuit Court.—*Hon. Jas. E. Hazell,* Judge.

AFFIRMED.

*Edmund Burke* for appellant.

(1) The information was not verified by the oath of the prosecuting attorney; neither was it verified by the oath of some person competent to testify as a witness in the case; neither was it supported by the affidavit of such person; neither has any such affidavit been filed with said information. R. S. 1899, sec. 2477. The form of the affidavit required to be made by the prosecuting attorney will be found in section 2479, Revised Statutes 1899. The only difference between the affidavit to be made by a private person and that made by the prosecuting attorney is, that the private person must be competent to testify of his own knowledge, and the prosecuting attorney is only required to make affidavit as to his best information and belief; but an affidavit of one is imperatively required. Sec. 2477, R. S. 1899. (2) The offense with which this defendant is charged is alleged to have been committed on the sixteenth day of November, 1900, while the amendment changing the mode of prosecutions by indictment or by information did not take effect until the twentieth day of December, 1900, when by the proclamation of the Governor of Missouri the amendment was declared to have received the requisite vote of the people. (3) This information was filed on the third day of January, 1901, in the vacation of the circuit court, with the clerk thereof, and without any order or

State v. Kyle.

direction of the court or the judge thereof, and was never presented to the court, nor filed by its direction, and the filing thereof by the clerk in vacation of court was a nullity. Blackstone's Commentaries, side paging 311; 5 Bacon's Abridgment, pp. 172, 180, 181, 182; R. v. Willett, 6 T. R. 294; 2 Houck, P. E. C. C. 20, sec. 10; secs. 2512, 2513, R. S. 1899.

*Boyle, Priest & Lehmann* and *Walter H. Saunders,* amici curiae.

(1) It is the duty of the courts to determine whether or not supposed constitutional amendments have been adopted. State v. McBride, 4 Mo. 303; Edwards v. Lesueur, 132 Mo. 410; art. 15, sec. 2, Constitution. (2) The petit-jury amendment (the seventh) attempted to submit two distinct propositions: first, the proportion of jurors requisite to return a verdict in courts not of record; second, in courts of record in such a way that both propositions had to be voted on jointly. It therefore violated the constitutional mandate (article 15, section 2) which requires each proposed amendment to the Constitution to be so submitted that it may be voted on separately, and this double-barreled resolution must snap. State v. Powell (Miss.), 27 So. Rep. 927; Am. Law Rev. July-August, 1900, p. 615.

*Edward C. Crow* Attorney-General, for the State.

(1) It is well settled that all negative or prohibitory clauses in a Constitution are self-enforcing. St. Joseph Board of Public Schools v. Patten, 62 Mo. 444; Ex Parte Snyder, 64 Mo. 58; Cummings v. Winn, 89 Mo. 56; Willis v. St. Paul Sanitarium Co., 16 L. R. A. 282; Hickman v. City of Kansas, 23 L. R. A. 662; Householder v. City of Kansas, 83 Mo. 488; Sheehy v. Railroad, 94 Mo. 574; Keith v. Bingham, 100 Mo. 300; Law v. People ex rel., 87 Ill. 385; Hills

Vol 166 mo—19

v. Chicago, 60 Ill. 86; 69 Cal. 479; 61 Cal. 276; 56 Cal. 649; 129 Pa. 151; Railroad v. Ihlenberg, 34 L. R. A. 396.    Prohibitory provisions in a Constitution are usually self-enforcing to the extent that anything done in violation of them is void. Willis v. St. Paul Sanitarium Co., 16 L. R. A. 285.    The question of the intention of those framing and adopting the amendment is, of course, the one that will control, and if an amendment is complete in itself as definitive legislation, then it will be held self-enforcing.    This is to be determined from a consideration of the language used and the intrinsic nature of the provision itself.    If the nature and the extent of the right conferred is such that it can be determined by an examination and construction of its own terms and no language is used indicating that the subject is to be referred to the Legislature for action, then the provisions should be construed as self-enforcing.    (2)    The terms, "information" and "indictment," used in the Constitution, are to be understood in their common-law sense.    Ex Parte Slater, 72 Mo. 102; State v. Kelm, 79 Mo. 515.    (3)    The provisions became operative when the result of the canvass was announced December 20, 1900.    15 Tex. App. 50; 42 N. Y. 277; 62 N. W. 267.    (4)    Amendment providing for prosecution by information for felonies is not an *ex post facto* law.    A law changing the mode of procedure from indictment to information in cases of offenses already committed is not an *ex post facto* law, and does not infringe upon any substantial right of the offenders.    In re Wright, 13 L. R. A. 748; Session Acts Wyoming, 1890-91, ch. 59, p. 213; Ex Parte Bethurum, 66 Mo. 550; State v. Thompson, 141 Mo. 410; Duncan v. Missouri, 152 U. S. 377; Cooley's Const. Lim., ch. 9, p. 326; Thompson v. Missouri, 171 U. S. 383.    (5)    Information need not be sworn to nor based upon the oath of another.    Art. 16, R. S. 1899; sec. 2477, R. S. 1899; State v. Ransberger, 106 Mo. 136; sec. 2750, R. S. 1899; 61 Mo. App. 159; State v. Briscoe, 80 Mo. 644; 88 Mo. 650.    The information at common law was an

State v. Kyle.

accusation exhibited against a person for a criminal offense by the Attorney-General or the Solicitor-General and at his direction and under his oath of office and without oath. 4 Blackstone, pp. 308, 309 and 310; 1 Chitty's Criminal Law, pp. 845 and 846; 1 Bishop Criminal Procedure, sec. 144; State v. Kelm, 79 Mo. 515; State v. Briscoe, 80 Mo. 643.   (6) The Attorney-General, at common law, need not ask leave of court to file an information. 4 Blackstone's Commentaries, p. 309; 2 Bishop Criminal Procedure, sec. 142.   (7)   The court will not even give him leave to file it for he does it of right.   42 Mo. App. 471; 1 Bishop Criminal Procedure, sec. 142.   Blackstone says, as to the filing of informations, "For offenses so high and dangerous in the punishment or prosecution of which a moment's delay would be fatal, the law has given the crown the power of an immediate prosecution." 4 Blackstone, 309.   An information can be filed with the clerk, and need not be filed in open court.   10 Enc. of Pleading and Practice, p. 456; 42 Tex. 88; 27 Mo. App. 628.

BURGESS, C. J.—Defendant was convicted in the circuit court of Moniteau county of robbery in the first degree and his punishment fixed at five years' imprisonment in the penitentiary, under an information filed by the prosecuting attorney of said county in the office of clerk of the circuit court in vacation.   He appeals.

On the evening of November 15, 1900, M. L. Moad, a farmer residing in said county, made his appearance in California very much under the influence of liquor, and with thirteen dollars and sixty-five cents in his pocketbook made his way into the barn of Mr. Swillum which was in the rear of a saloon kept by him.   Moad finally got into an alley a few feet in the rear of the saloon.   The rear of the residence of Swillum abutted close upon the alley.   The daughter of Swillum and another young lady, being attracted by noise made by Moad, directed the defendant, who was about the saloon, to

remove him elsewhere. The testimony of the defendant, the young ladies and Moad all agree that defendant obeyed the order given him and immediately approached the spot where Moad had located himself. The young ladies testified that at that time they could not see Moad. The reason was, as disclosed later, he was sitting down against the fence. Defendant says he went to Moad and asked him to go away as the ladies were objecting to his conduct. Moad says defendant told him that. Moad says he remarked to the defendant that if the ladies and defendant would let him alone he would not bother them. But defendant and Moad both agree that the defendant and the ladies were not willing to accept Moad's proposition to each let the other alone, and that the defendant "insisted on Moad's moving on," which defendant immediately saw would be quite contrary to Moad's wishes. Moad testifies the defendant took hold of him and he, Moad, gave him some small change in silver to go on and not molest him. That defendant took the silver. That in the meantime Moad became alarmed lest the defendant rob him and that he took his pocketbook, containing thirteen dollars and sixty-five cents out, and held it in his hand. That the defendant, seeing the pocketbook, grabbed hold of Moad and he resisted, and the defendant then forcibly opened Moad's hand and took the pocketbook and ran away. The young ladies said the light was indistinct, and that from where they stood they could tell very little of what was going on.

The defendant said he helped Moad up and aided him to a wheelbarrow near by and Moad tumbled into it and defendant left, but the defendant denied having taken any money from Moad. The testimony showed Moad had two five-dollar bills and the rest in silver. A few minutes after this occurrence the defendant went to Conrad's meatshop and bought some meat and paid for it with a five-dollar bill and received the change. The defendant admitted this, but testified that he got it from his wife. She testified he came home that

evening and got it and went after the meat.   He said he left Moad and went home and got the money and returned and bought the meat.   Moad, soon after the occurrence in the alley, went into the saloon, so Swillum testified, and then passed out again.   About an hour later, Swillum, after returning from his supper, found Moad sitting in a stooping position on the ground in the rear of his saloon and invited him in and he came.   Swillum said Moad remarked when he came in that before supper he felt like vomiting, and Swillum told him in that event he had better retire, and Moad adopted the suggestion and retreated from the saloon.

When Moad came into the saloon the second time he took a seat and stayed until about 11 o'clock, and on leaving complained to Swillum that he had been robbed.

The counsel for the defendant moved to quash the information, alleging various reasons, and among others that the information was not properly signed by the prosecuting attorney, and because it was filed in vacation of the court, and because the offense was a felony and when it was committed the Constitution required all felonies to be prosecuted by indictment, and because the information was not sworn to by the officers, and because it was not supported by the affidavit of any citizen.

The information, leaving off the style of the cause, is as follows:

"In the Circuit Court of Moniteau County, Missouri, January Term, 1901.

"N. S. Hickcox, prosecuting attorney within and for the county of Moniteau in the State of Missouri, under his oath of office, and upon his best knowledge, information and belief, informs the court that Charles Kyle, on the sixteenth day of November, 1900, at the county of Moniteau and State of Missouri, in and upon one M. L. Moad, unlawfully and feloniously did make an assault, and fourteen dollars of the lawful money

of the United States of the value of fourteen dollars, the property of the said M. L. Moad from the person and against the will of the said M. L. Moad then and there by force and violence to the person of the said M. L. Moad, feloniously did rob, steal, take and carry away, against the peace and dignity of the State.

"N. C. HICKCOX, Prosecuting Attorney."

"By the law of England, informations by the Attorney General, without the intervention of a grand jury, were not allowed for capital crimes, nor for any felony, by which was understood any offense which at common law occasioned a total forfeiture of the offender's lands, or goods, or both. [4 Black Com. 94, 95, 310.] The question whether the prosecution must be by indictment, or might be by information, thus depended upon the consequences to the convict himself." [Ex Parte Wilson, 114 U. S. 417; 1 Bishop's New Criminal Procedure, secs. 141, 142.]

And not until the amendment of section 12 of article 2 of the State Constitution, adopted at the general election held on November 8, 1900, by which it is provided that "no person shall be prosecuted criminally for felony or misdemeanor otherwise than by indictment or information, which shall be concurrent remedies," could a person be prosecuted criminally in this State for a felony otherwise than by indictment, "except in cases arising in the land and naval forces, or in the militia when in actual service in time of war or public danger," but since that time they have been and are now concurrent remedies.

The offense charged in the information was committed on the sixteenth day of November, 1900, and it becomes important in the outset to determine when the constitutional amendment took effect, whether before or after the commission of the offense.

The provision of our Constitution, with respect to amendments, reads as follows:

"Sec. 2. *General Assembly may propose amendments submitted to vote.* The General Assembly may, at any time, propose such amendments to this Constitution as a majority of the members elected to each house shall deem expedient; and the vote thereon shall be taken by yeas and nays, and entered in full on the journals. The proposed amendments shall be published with the laws of that session, and also shall be published weekly in some newspaper, if such there be, within each county in the State, for four consecutive weeks next preceding the general election then next ensuing. The proposed amendments shall be submitted to a vote of the people, each amendment separately, at the next general election thereafter, in such manner as the General Assembly may provide. If a majority of the qualified voters of the State, voting for and against any one of said amendments, shall vote for such amendment, the same shall be deemed and taken to have been ratified by the people, and shall be valid and binding, to all intents and purposes, as a part of this Constitution."

As a general rule a constitutional amendment takes effect from the day of its ratification by the voters to whom it is submitted for that purpose [In re Deckert, 2 Hughes (U. S.), 183], but an exception to this rule is when a different provision is made by law.

It will be observed that section 2, supra, provides that, "If a majority of the qualified voters of the State, voting for and against any one of said amendments, shall vote for such amendment, the same shall be deemed and taken to have been ratified by the people, and shall be valid and binding, to all intents and purposes, as a part of this Constitution," which, when taken by itself is so clear that the amendment was in force and effect from the time it was ratified by the vote of the people as to leave no room for construction. "The rule of the common law is, that every law takes effect immediately

upon its passage, unless some other time is therein prescribed for that purpose." [Real v. The People, 42 N. Y. 270.]

In 1894, there was submitted to the qualified voters of the State of Florida for ratification an amendment to section 9 of article 16 of the Constitution of that State, and the question as to the time when it took effect and become operative as part of the State Constitution, was before the Supreme Court for an advisory opinion to the Governor. [34 Florida, 500.] Section 1 of article 17, of the Constitution, prescribed the manner in which amendments to that instrument should thereafter be made as follows: "Either branch of the Legislature, at a regular session thereof, may propose amendments to this Constitution; and if the same be agreed to by three-fifths of all the members elected to each house, such proposed amendments shall be entered upon their respective journals with the yeas and nays, and published in one newspaper in each county where a newspaper is published, for three months immediately preceding the next general election of representatives, at which election the same shall be submitted to the electors of the State, for approval or rejection. If a majority of the electors voting upon the amendments at such election shall adopt the amendments, the same shall become a part of the Constitution. The proposed amendments shall be so submitted as to enable the electors to vote on each amendment separately."

The court said: "Under this provision of the organic law there seems to us to be no room for doubt but that any amendment thereto if proposed, approved and adopted in the manner therein pointed out, becomes operative and of full force and effect as part of the Constitution *eo instanti* upon its approval and adoption by the majority vote of the electors of the State. . . . . . The effect of the approval and adoption of said amendment by a majority of the electors voting upon the same at the general election held in October, A. D. 1894, under its submission to the electors of the State for their ap-

proval or rejection in the manner prescribed, was to substitute said amendment, at once upon the majority of the votes being cast in favor of its approval, in the place and stead, as part of the Constitution, of the original section to which it was an amendment, and the original section, that said amendment then took the place of, at once ceased to be operative as any part of the original law."

So in the case of The Seneca Mining Company v. Osmun, Secretary of State, 82 Mich. 573, it was held that under section 1 of article 20 of the Constitution of that State, which provides for the submission of proposed constitutional amendments at the next spring election, such amendments took effect from the time of their ratification by the popular vote.

So in Illinois, the schedule of the Constitution of that State of 1870, section 8, provided "that the Constitution should be submitted to the people for adoption or rejection at the election to be held on July 3, 1870, that so much of the Constitution as was not separately submitted to be voted on by articles and sections should be the supreme law of the State on and after the eighth day of August, 1870;" and it was held that one of the articles which was submitted separately became a part of the organic law of the State from and after the day on which the Constitution was voted upon, to-wit, July 2, 1870. [Schall v. Bowman, 62 Ill. 321.] That case was followed in Wade v. Town of LaMoille, 112 Ill. 79, and in Wade v. Walnut, 105 U. S. 1.

Upon the other hand, in the case of Sewell v. The State, 15 Tex. App. 56, was involved the question as to the term when an amendment to the Constitution of that date, which had been adopted by the people, took effect. The amendment was one "proposing an amendment to article 5, of the State Constitution, diminishing the number of terms of the county courts," and declaring that, "until otherwise provided, the terms of the county court shall be held on the first Mondays in February, May, August and November, and may remain in

session three weeks." The facts as stated by the court are as follows: "These proposed amendments were voted upon and, as afterward appeared upon a count of the vote, were adopted by the people at an election held in conformity with a proclamation of the Governor (authorized and required by Joint Resolution No. 8, Gen. Laws, p. 136), on the seventh day of August, 1883. No provision having been made as to the mode and manner of the returns of the votes at said election, by provision of article 1759, Revised Statutes, the rules prescribed in the general election law of the State are made applicable 'to all elections, whether for officers or for other purposes.' By this general law it is provided, in article 1710, that 'on the fortieth day after the election, the day of election excluded, and not before, the Secretary of State, in the presence of the Governor and Attorney-General, or in case of vacancy in either of said offices, or of inability or failure of either of said officers to act, then in presence of either one of them, shall open and count the returns of elections.' And by article 17 of the Constitution, declaring the mode of amending the same, it is provided that if it shall appear from said returns that a majority of the votes cast have been cast in favor of any amendment, the said amendment so receiving a majority of the votes cast shall become a part of the Constitution, and proclamation shall be made by the Governor thereof." It was held that the result of the election was determined on the day of the canvass of the returns and the declaration thereof, but the court held it to be unnecessary to decide whether the amendment become operative *eo instanti* on counting the vote or whether it derived its operative force from the Governor's proclamation declaring the fact of its adoption.

The Constitution of Texas, article 17, section 1, provides that, if it shall appear from the election returns that a majority of the votes have been cast in favor of any constitutional amendment, it shall become a part of the Constitution, and proclamation shall be made by the Governor thereof. By Re-

vised Statutes 1879, article 1710, the Secretary of State, on the fortieth day after the election, and not before, is required to open and count the returns. It was held that the amendment in question which was adopted by vote of the people on August 14, 1883, and the result proclaimed by the Governor on September 25, 1883, was not in effect on September 13, 1883, so as to authorize the city of Cerburne on that date to incur an indebtedness for the erection of waterworks. [Ellis v. Cerburne, 35 S. W. 495.]

Section 1, article 14, of the Constitution of Minnesota, relating to amendments to that instrument, provides that, "If it shall appear in a manner to be provided by law, that a majority of voters present and voting shall have ratified such alterations or amendments, the same shall be valid to all intents and purposes, as a part of the Constitution." The manner in which the result was to be ascertained was left to be provided by law, which was as follows: "A proposed amendment should be submitted to the people of said State for their approval or rejection at the next general election for the year A. D. eighteen hundred and eighty-one, and each of the legal voters of said State may at such election vote by poll for or against said amendment and the returns thereof shall be made and certified and such votes canvassed and the result thereof declared in the manner provided by law for returning, certifying and canvassing votes for general elections for State officers and declaring the result thereof, and if it shall appear that a majority of the voters present and voting at said election upon said amendment, have voted in favor of the same, then immediately after the result shall have been ascertained, the Governor shall make proclamation thereof and said amendment shall thereupon take effect and be in full force as part of the Constitution of the State of Minnesota." It was held that the amendment did not take effect, at least until the result was ascertained by the canvass of the vote. [City of Duluth v. Duluth St. Ry. Co., 60 Minn. 178.]

Now, section 7123, Revised Statutes 1899, provides that the election in any proposed constitutional amendment or amendments shall be conducted and the returns made thereof to the several county clerks, and shall by them be certified to the Secretary of State, as provided by law in cases of the election of State officers.

Section 7124, Revised Statutes 1899, provides that: "If, upon such returns so made to the Secretary of State, it is found that there is a majority of the qualified voters of the State voting for and against any one of said amendments, in favor of such amendments, the same shall be deemed and taken to have been ratified by the people, and the Secretary of State shall certify the result of such vote to the Governor, who shall thereupon, without unnecessary delay, issue his proclamation declaring such amendment ratified by a majority of the qualified voters of this State, and valid and binding to all intents and purposes as a part of the Constitution of the State of Missouri."

It will be noted that our statute with respect to the result of the vote on constitutional amendments, and the ascertainment thereof, is in almost the exact language of the Constitution of Texas, and law of Minnesota, that is, if upon the returns made of the vote by the several county clerks to the Secretary of State, it be found that there is a majority of the qualified voters of the State voting for any particular amendment, the same shall be deemed and taken to have been ratified by the people, and the Secretary of State shall certify the result of such vote to the Governor who shall thereupon issue his proclamation, etc., in which States it is held that the amendment takes effect and is in force from the day of the canvass of the vote, but not before.

As was said by the Court of Appeals in New York in passing upon a similar subject: "The result of the election showing the adoption of this article by a majority of the votes cast, must, within the meaning of the rule, be deemed its passage.

The canvass of the votes cast by the various boards of canvassers as required by law, and announcing the result and certifying the same as required by law, is as much a part of the election as the casting of the votes by the electors. The election is not deemed complete until the result is declared by the canvassers as required by law. When the result was declared by the state board of canvassers, the article was adopted, and under the rule, became operative at once, unless from the nature of the provisions themselves, or those of some other law, it appears that it was to take effect at some future period, or unless it clearly appears that the intention of the framers of the article, and of those by whom it was adopted, was, that it should not take effect until some definite future time." [Real v. The People, 42 N. Y. 276.]

The deduction to be drawn from these authorities is, that the amendment in question became a part of the Constitution of this State when adopted by the vote of the people at the election held on November 8, 1900, and took effect and went into operation upon the canvass of the vote on the nineteenth day of December next thereafter, and not before.

These observations find support in the fact that at the same election there was submitted to the vote of the people of the State and adopted by them another amendment to the Constitution (Laws 1899, p. 382), by which it was provided that, "Hereafter a grand jury shall consist of twelve men, any nine of whom concurring may find an indictment or a true bill; Provided, however, that no grand jury shall be convened except upon an order of a judge of a court having the power to try and determine felonies." Now, in the absence of a canvass of the vote upon these amendments, courts having criminal jurisdiction had no means of ascertaining the result of the vote of the people upon them whether adopted or not and were simply groping in the dark as to whether or not felonies might be prosecuted by information as well as by indictment, or whether as the Constitution was before the amendment,

grand juries were usually convened at each regular term, or under the amendment they could only be convened except by an order of a judge of a court having the power to try and determine felonies, and we are satisfied that in order to avoid any embarrassments or complications that might arise under such circumstances, the Legislature intended that the amendments should take effect and be operative from the time of the canvass of the vote therein.

The next question is was the amendment in question self-operating from the time it took effect? It pertains to criminal procedure and is prohibitory in character, and it is well settled that all such clauses in a Constitution are self-enforcing. [St. Joseph Board of Public Schools v. Patten, 62 Mo. 444; Householder v. City of Kansas, 83 Mo. 488; Hickman v. City of Kansas, 120 Mo. 110.]

There are a number of provisions in the Constitution of this State, that are unquestionably self-executing, and require no legislation to put them in operation. The test in such cases is, can the Constitution as amended be enforced without the aid of legislation? "The question in every case is whether the language of a constitutional provision is addressed to the courts or the Legislature; does it indicate that it was intended as a present enactment, complete in itself as definitive legislation, or does it contemplate subsequent legislation to carry it into effect? This is to be determined from a consideration both of the language used and of the intrinsic nature of the provision itself. If the nature and extent of the right conferred and of the liability imposed are fixed by the provision itself, so that they can be determined by the examination and construction of its own terms, and there is no language used indicating that the subject is referred to the Legislature for action, then the provision should be construed as self-executing, and its language as addressed to the courts." [Willis v. Mabon, 48 Minn. 140.]

There is nothing in the language used in the amendment

which indicates that subsequent legislation was necessary or intended to carry it into effect, nor was it, as it simply prohibits any other mode for the prosecution of felonies (except certain cases as therein provided), otherwise than by indictment or information. The case of Fusz v. Spaunhorst, 67 Mo. 256, is distinguishable from the one at bar in that the section of the Constitution under which that case arose declared that it should be a crime, the nature and punishment of which shall be prescribed by law, clearly indicating that subsequent legislation was, in the minds of the lawmakers, necessary to carry it into effect, while no such intimation is to be found in the amendment in question, nor can it be inferred from the language used.

The terms "information" and "indictment" as used in the Constitution, are to be understood in their common-law sense. [Ex Parte Slater, 72 Mo. 102; State v. Kelm, 79 Mo. 515.] In the Kelm case it was held that the term "information" as used in article 2, of section 12 of the State Constitution of 1875, was to be understood in its common-law sense, that is, a criminal charge which at common law is presented by the Attorney-General, or if that office is vacant, then by the Solicitor-General of England and in this State by the prosecuting attorneys of the respective counties who exercise the same powers as are exercised by the Attorney-General or Solicitor-General of England, that is, the power to present informations under their official oaths.

The question then arises as to whether or not the amendment authorizes the prosecution of felonies by information, it having gone into operation after the commission of the offense with which defendant stands charged, or is it as to such offense an *ex post facto* law. By the Constitution of the United States, section 10, article 1, and by the Constitution of this State, section 15, article 2, *ex post facto* laws are prohibited.

In Calder v. Bull, 3 Dall. 386, *ex post facto* laws are said

to be: "First. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal, and punishes such action. Second. Every law that aggravates a crime, or makes it greater than it was when committed. Third. Every law that changes the punishment, and inflicts a greater punishment than the law annexed to the crime when committed. Fourth. Every law that alters the legal rules of evidence, and receives less or different testimony than the law required at the time of the commission of the offense, in order to convict the offender. All these and similar laws are manifestly unjust and oppressive. In my opinion, the true distinction is between *ex post facto* laws and retrospective laws. Every *ex post facto* law must necessarily be retrospective, but every retrospective law is not an *ex post facto* law. The former only are prohibited. Every law that takes away or impairs rights vested, agreeably to existing laws, is retrospective, and is generally unjust, and may be oppressive; and it is a good general rule, that a law should have no retrospect; but there are cases in which laws may justly, and for the benefit of the community, and also of individuals, relate to a time antecedent to their commencement; as statutes of oblivion or of pardon. They are certainly retrospective, and literally both concerning and after the facts committed. But I do not consider any law *ex post facto*, within the prohibition, that mollifies the rigor of the criminal law; but only those that create or aggravate the crime, or increase the punishment, or change the rules of evidence for the purpose of conviction. Every law that is to have an operation before the making thereof, as to commence at an antecedent time, or to save time from the statute of limitations, or to excuse acts which were unlawful, and before committed, and the like, is retrospective. But such laws may be proper or necessary, as the case may be. There is a great and apparent difference between making an unlawful act lawful, and the making an innocent action criminal, and punishing it as a crime. The

expressions '*ex post facto* laws' are technical; they had been in use long before the Revolution, and had acquired an appropriate meaning, by legislators, lawyers, and authors." [Ex Parte Bethurum, 66 Mo. 545.]

Under this definition of an *ex post facto* law, the amendment, although providing for another mode of procedure for the prosecution of felonies than by indictment does not fall within the meaning of an *ex post facto* law as thus defined, for it does not make an action done before its adoption criminal, nor does it aggravate the crime, or in any way affect it, nor change the punishment nor alter the legal rule of evidence; but, as has been said, goes merely to the mode of procedure. The mode of investigating the facts remain as before, and this through a trial by a jury of defendant's own choosing, surrounded by certain safeguards guaranteed to him by the laws of the land, which can not be dispensed with.

In Cooley's Constitutional Limitations (6 Ed.), p. 326, it is said: "But so far as mere modes of procedure are concerned, a party has no more right, in a criminal than in a civil action, to insist that his case shall be disposed of under the law in force when the act to be investigated is charged to have taken place. Remedies must always be under the control of the Legislature, and it would create endless confusion in legal proceedings if every case was to be conducted only in accordance with the rules of practice, and heard only by the courts, in existence when its facts arose. The Legislature may abolish courts and create new ones, and it may prescribe altogether different modes of procedure in its discretion, though it can not lawfully, we think, in so doing, dispense with any of those substantial protections with which the existing law surrounds the person accused of crime. Statutes giving the Government additional challenges, and others which authorized the amendment of indictments, have been sustained and applied to past transactions, as doubtless would be any similar statute, calcu-

Vol 166 mo—20

lated merely to improve the remedy, and in its operation working no injustice to the defendant, and depriving him of no substantial right."

In re Wright, 3 Wyoming 478, it was ruled that a law changing the mode of procedure from indictment to information in cases of felonies already committed, is not *ex post facto*, and does not infringe any substantial right of the offender. The same rule is announced in State v. Thompson, 141 Mo. 408; Duncan v. Missouri, 152 U. S. 377.

From these considerations it must follow that the amendment was not *ex post facto*.

As there was no statute in this State at the time the constitutional amendment went into effect prescribing the mode of procedure by information in the prosecution of felonies in the courts of record in this State, and as the information therein meant is to be understood in its common-law sense, that is, a criminal charge exhibited by the Attorney-General or other proper officer, we must look to that law for light upon the subject.

The common-law information was an accusation of a criminal character exhibited against a person charging him or her with a criminal offense by Attorney-General or the Solicitor-General, and under his oath of office. Bishop says: "The criminal information should be deemed to be such, and such only, as, in England, is presented by the Attorney- or Solicitor-General. This part of the English common law has plainly become ours. And as, with us, the powers which in England are exercised by the Attorney-General and the Solicitor-General are largely distributed among our district attorneys, whose office does not exist in England, they would seem to be entitled, under our common law, to prosecute by information, as a right adhering to their office, and without leave of court." [1 Bishop's New Criminal Procedure (4 Ed.), sec. 144.] Nor was it necessary at common law for an officer authorized to file information to ask leave of court to do so.

[1 Bishop on Criminal Procedure, sec. 142; State v. Kelm, supra; State v. Dover, 9 N. H. 468; State v. Ransberger, 42 Mo. App. 466.] Nor was the information invalid because filed in vacation of court (State v. Corbit, 42 Tex. 88), nor because the prosecuting attorney placed the initials of his given name to the information instead of writing it out in full. [State v. Kinney, 81 Mo. 103.]

It is insisted that the court erred in permitting one John Swillum, a witness for the State, to testify to what the prosecuting witness Moad said to him some and one-half hours after the robbery, but this seems to be a misapprehension of the facts as disclosed by the record, from which it does not appear that any such evidence was admitted.

All of the instructions are criticised by defendant, but we think without any ground therefor. They covered all the facts of the case, and were exceedingly fair to the defendant. In fact, some of them more so than the law warranted. Finding no reversible error in the record, we affirm the judgment. All concur.