[No. 3115, May 16, 1927.   Rehearing Denied, July 25,

1927.]

## STATE v. KAVANAUGH.

### [258 Pac. 209.]

#### SYLLABUS BY THE COURT

The Constitution of New Mexico (section 14 of article 2) provided that ''No person shall be held to answer for a capital, felonious or infamous crime unless on a present- ment or indictment of a grand jury, except in cases aris- ing in the militia when in actual service in time of war or public danger.'' The statutes of New Mexico prior to the adoption of the Constitution and for a time thereafter pro- vided that a grand jury should be composed of 21 persons, and that 12 must concur in finding an indictment. Held, that the amendment to section 14, art. 2, of the Constitu- tion, which took effect January 1, 1925 (see Laws 1923, p. 351), providing, among other things, that a grand jury should, unless otherwise provided by law, consist of 12 in number, and that of such number at least 8 must concur in finding an indictment, does not disparage any substantial

[1] 12CJ p. 1105 n. 88; 28CJ p. 783 n. 73.

or constitutional guaranty and is not ex post facto, therefore, in applying to offenses committed prior to its adoption.

Appeal from District Court, San Miguel County; Armijo, Judge.

Juan D. Kavanaugh was convicted of a crime, and he appeals . Affirmed.

D. J. Leahy, of East Las Vegas, and E. R. Wright, of Santa Fe, for appellant.

Fred E. Wilson, Atty. Gen., for the State.

Renehan & Gilbert, of Santa Fe, amicus curiae.

OPINION OF THE COURT

BICKLEY, J.   Appellant was indicted and convicted of a crime.

Section 14 of article 2 of our Constitution prior to amendment provided:

"No person shall be held to answer for a capital, felonious, or infamous crime unless on a presentment or indictment of a grand jury, except in cases arising in the militia when in actual service in time of war or public danger."

The date of the commission of the crime charged was after the adoption of the New Mexico Constitution and prior to the amendment thereof, which took effect January 1, 1925 (see Laws 1923, p. 351), and provided that a grand jury should, until otherwise provided by law, consist of 12 in number, and that of such number at least 8 must concur in finding an indictment.

Appellant has called our attention to the opinion of the Attorney General of New Mexico No. 882, construing the section of our Constitution, quoted supra, to mean a presentment or indictment by grand jury as known to the common law, and that it was not within the power of the Legislature to make grand juries of greater or less number than was permissible at common law.   The Attorney General, however, went on to say:

"In many states it seems that by constitutional provision smaller grand juries are authorized, as in Iowa the Con-

stitution provides for a grand jury of from 5 to 15; in Colorado, the Constitution limits the grand jury to 12; in Kentucky, the Constitution provides that the grand jury shall be 12; in Montana, the Constitution reduced the grand jury from 16 to 7; and in Texas the Constitution provides for a grand jury. of 12."

It has been decided that the provision of the federal Constitution for "due process of law" does not require that a grand jury. finding an indictment shall be composed, as at common law, of the common-law number of grand jurors. See Parker v. People, 13 Colo. 155, 21 P. 1120, 4 L. R. A. 803. The opinion in this case is based upon the decision of the United States Supreme Court in Hurtado v. California, 110 U. S. 516, 4 S. Ct. 111, 292, 28 L. Ed. 232, which decided that due process of law in criminal cases did not make any grand jury necessary but might be satisfied by information even in case of felony, and that the statute may modify the accusatory system between the two extremes of the common-law grand jury and prosecution by information. In this connection, see, also, Matter of Moran, 203 U. S. 96. 27 S. Ct. 25. L. Ed. 105. where the court was considering the Fifth Amendment to the federal Constitution, which is in language identical with that of our Constitution (section 14, article 2) quoted supra. The court there said:

"The Fifth Amendment, requiring the presentment or indictment of a grand jury, does not take up unto itself the local law as to how the grand jury should be made up, and raise the latter to a constitutional requirement."

We do not understand that appellants urge that our constitutional amendment in question is repugnant to the Fifth Amendment to the federal Constitution. The exact point urged is that such amendment to section 14 of article 2 of our Constitution is an ex post facto law as applied to offenses committed prior to the adoption of such constitutional amendment.

We have been aided in our labor by able arguments. Counsel for appellant have shown a commendable spirit in citing the adjudicated cases touching upon this important question, regardless of whether they support appellant's contentions or not. Amicus curiae in an

able brief support the contentions of appellant.

Section 10 of article 1 of the federal Constitution provides:

"No state shall * * * pass any * * * ex post facto law."

We will assume, though not deciding, for the purpose of this consideration, that the provisions of the federal Constitution apply not only to the mere acts of the Legislature, but to changes in the fundamental law of the state.

Appellant says:

"The following cases hold either that the changing of the practice from indictment to information; information to indictment; or changing the number of grand jurors, are merely changes of rules of procedure, and that as such they are subject to change and not substantive vested rights: Hallock v. United States (C. C. A.) 185, F. 417 (but see dissenting opinion of Judge Sanborn); Lybarger v. State, 2 Wash. 552, 27 P. 449, 1029; State v. Hoyt, 4, Wash. 818, 30 P. 1060; In re Wright, 3 Wyo. 478, 27 P. 565, 13 L. R. A. 748, 31 Am. St. Rep. 94; People v. Campbell, 59 Cal. 243, 43 Am. Rep. 257; Sage v. State, 127 Ind. 15, 28 N. E. 667.

"Again, it wil be noted, in examining the cases which hold that such constitutional changes are not ex post facto as to crimes committed prior to the constitutional change, that the courts so holding have in all cases failed to recognize the definitions of an ex post facto law heretofore cited and quoted by us as being one of the recognized definitions of an ex post facto law in the federal courts. They have attempted to limit their definitions of such acts as set out in the case of In re Wright,, 3 Wyo. 478, 27 P. 565, 13 L. R. A. 748, 31 Am. St. Rep. 94. The court there limits its definition of ex post facto laws to the following:

"(1) Every law that makes an action done before the passing of the law, and which was innocent when done, criminal, and punishes such action.

"(2) Every law that aggravates a crime or makes it greater than when it was committed.

"(3) Every law that changes the punishment, and inflicts a greater punishment than the law annexed to the crime when committed.

"(4) Every law that alters the legal rules of evidence, and receives less or different testimony than the law required at the time of the commission of the offense, in order to convict the offender."

It is to be noted, however, that the state courts have generally followed and frequently cited the case of Calder v. Bull, 3 Dall. 386, 1 L. Ed. 648, which is the leading federal case on the subject. 1 Watson on the Constitution, pp. 739-741, comments on this case and quotes therefrom as follows:

"The subject of ex post facto laws was first considered by the Supreme Court of the United States in Calder v. Bull. While the judges delivered separate opinions the principal opinion seems to have been delivered by Mr. Justice Chase, whose definition of an ex post facto law, and whose classification of the subject, as well as his general comments thereon, have met the approval of the bench of the country for more than a century, and are as follows:

" 'I shall endeavor to show what law is to be considered an ex post facto law, within the words and meaning of the prohibition in the federal Constitution. The prohibition, 'That no State shall pass any ex post facto law,' necessarily requires some explanation; for, naked and without explanation, it is unintelligible, and means nothing. Literally, it is only, that a law shall not be passed concerning, and after the fact, or thing done, or action committed. I would ask, what fact; of what nature or kind; and by whom done?   That Charles I, King of England, was beheaded; that Oliver Cromwell was protector of England; that Louis XVI, late king of France was guillotined; are all facts that have happened; but it would be nonsense to suppose, that the states were prohibited from making any law, after either of these events, and with reference thereto. The prohibition, in the letter, is not to pass any law concerning, and after the fact; but the plain and obvious meaning and intention of the prohibition is this: that the Legislatures of the several states, shall not pass laws, after a fact done by a subject or citizen, which shall have relation to such fact, and shall punish him for having done it.   The prohibition, considered in this light, is an additional bulwark in favor of the personal security of the subject, to protect his person from punishment by legislative acts, having a retrospective operation. I do not think it was inserted, to secure the citizen in his private rights of either property or contracts. The prohibitions not to make any thing but gold and silver coin a tender in payment of debts, and not to pass any law impairing the obligation of contracts, were inserted to secure private rights; but the restriction, not to pass any ex post facto law, was to secure the person of the subject from injury or punishment, in consequence of such law. If the prohibition against making ex post facto laws was intended to secure personal rights from being affected or injured by such laws, and the prohibition is sufficiently extensive for that object, the other restraints I have enumerated, were unnecessary, and therefore, improper; for both of them are retrospective.

" 'I will state what laws I consider ex post facto laws, within the words and the intent of the prohibition. First. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. Second. Every law that aggravates a crime, or makes it greater than it was, when committed. Third. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. Fourth. Every law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offense, in order to convict the offender. All these, and similar laws, are manifestly unjust and oppressive. In my opinion, the true distinction is between ex post facto laws, and retrospective laws. Every ex post facto law must necessarily be retrospective; but every retrospective law is not an ex post facto law: The former, only are prohibited. Every law that takes away or impairs, rights vested, agreeable to existing laws, is retrospective, and is generally unjust, and may be oppressive; and it is a good general rule, that a law should have no retrospect; but there are cases in which laws may justly, and for the benefit of the community, and also individuals, relate to a time antecedent to their commencement; as statutes of oblivion or of pardon. They are certainly retrospective, and literally both concerning and after the facts committed. But I do not consider any law ex post facto, within the prohibition, that mollifies the rigor of the criminal law; but only those that create or aggravate the crime; or increase the punishment, or change the rules of evidence, for the purpose of conviction. Every law that is to have an operation before the making thereof, as to commence at an antecedent time; or to save time from the statute of limitations; or to excuse acts which were unlawful, and before committed, and the like, is retrospective. But such laws may be proper or necessary, as the case may be. There is a great and apparent difference between making an unlawful act lawful; and the making an innocent action criminal, and punishing it as a crime. The expressions "ex post facto laws," are technical, they had been in use long before the Revolution, and had acquired an appropriate meaning, by legislators, lawyers and authors. The celebrated and judicious Sir William Blackstone, in his Commentaries, considers an ex post facto law precisely in the same light as I have done. His opinion is confirmed by his successor, Mr. Wooddeson; and by the author of the Federalist, whom I esteem superior to both, for his extensive and accurate knowledge of the true principles of government. "

Appellant relies upon the definition approved in Kring v. Missouri, 107 U. S. 235, 2 S. Ct. 449, 27 L. Ed. 506, substantially as follows:

"Any law passed after the commission of an offense which, * * * 'in relation to that offense, or its con-

sequence, alters the situation of a party to his disadvantage,' is an ex post facto law."

—and claims that this applies whether the law pertains to punishment or procedure merely.

In the elaborate Rose's Note on Calder v. Bull, supra, is a paragraph devoted to a discussion of the definition of the leading case as affected by Kring v. Missouri, supra, as follows:

"It only remains to consider the decision in the Kring Case, with the definition of the ex post facto laws, which it offered, and its effect upon the authority of that laid down in the principal case. Kring v. Missouri was the first case in which the Supreme Court felt called upon to withhold its approval from the long-established definition of Justice Chase, and the majority opinion contains a statement of the ex post facto prohibition which was manifestly believed to be more nearly accurate. See People v. McDonald, 5 Wyo. 533, 43 P. 17 [29 L. R. A. 834]. 'An ex post facto law,' it was said, 'is one which, in its operation, makes that criminal which was not so at the time the action was performed; or which increases the punishment, or, in short, which in relation to the offense or its consequences, alters the situation of a party to his disadvantage.' According to this definition which, it was affirmed, was a correct exposition of the term, the law in question in the case at bar was declared invalid as thus applied; because taking away what, by the law of the state at the time of the homicide, was a good defense to the charge of murder in the first degree. The dissenting judges relied largely upon the definition of the principal case, which, they insisted, included all objectionable forms of retrospective criminal legislation. Obviously the proposition that a law which alters the situation of an accused to his disadvantage is objectionable when applied ex post facto broadens the scope and operation of the constitutional prohibition considerably beyond the definition of the leading case. It is apparent, also, that it is broad enough to include all the laws declared ex post facto, which could not be brought fairly within the definition of Calder v. Bull. But the difficulty with it is that it seems to be too broad, and must be received with caution. It would include changes in procedure which have been declared unobjectionable, because depriving of no vested right, although manifestly to the possible disadvantage of an accused. Hopt v. Utah, 110 U. S. 574, 4 S. Ct. 202, 28 L. Ed. 262; Mrous v. State, 31 Tex. Cr. Rep. 599, 21 S. W. 764, 37 Am. St. Rep. 835. 'That decision,' observed the Supreme Court of Indiana, with reference to Kring v. Missouri, 'does not go to the extent of breaking down the general rule so long approved by the courts and text-writers, for the most that can be said of that decision is that it declared the mode of procedure may sometimes so far materially affect the

rights of an accused as to fall within the sweep of the constitutional provision prohibiting the enactment of ex post facto laws.' Sage v. State, 127 Ind. 19, 20, 26 N. E. 669. It would be a mistake to suppose that it has supplanted the definition of the principal case. And while the authorities recognize the modification which the Kring Case introduced (In re Medley, 134 U. S. 160, 10 S. Ct. 384, 33 L. Ed. 835; People ex rel. v. McDonald, 5 Wyo. 533, 42 P. 17 [29 L. R. A. 834]), they still cite, and to a large extent follow, the early decision (State v. Welch, 65 Vt. 54, 25 A. 901; Jones v. Commonwealth, 86 Va. 663, 10 S. E. 1006; Lybarger v. State, 2 Wash. 557, 27 P. 450 [1029]; People v. Hawker, 152 N. Y. 234, 240, 46 N. E. 608; Hawk v. New York, 170 U. S. 201, 18 S. Ct. 578, 42 L. Ed. 1007; In re Wright, 3 Wyo. 481, 483, 27 P. 566, 567 [13 L. R. A. 748] 31 Am. St. Rep. 97, 99; People ex rel. v. McDonald, 5 Wyo. 533, 42 P. 17 [29 L. R. A. 834]; Gibson v. Mississippi, 162 U. S. 590, 16 S. Ct. 910, 40 L. Ed. 1081; Lynn v. State, 84 Md. 78, 35 A. 22; Thompson v. Missouri, 171 U. S. 382, 383, 18 S. Ct. 922, 923, 43 L. Ed. 206."

In Gibson v. Mississippi, cited in the last preceding paragraph, both Calder v. Bull and Kring v. Missouri are considered. The provisions in question regulated the selection of jurors and their qualifications. The court said:

"The provision in question related simply to procedure. They only prescribed remedies to be pursued in the administration of the law, making no change that could materially affect the rights of one accused of crime theretofore committed. The inhibition upon the passage of ex post facto laws does not give a criminal a right to be tried, in all respects, by the law in force when the crime charged was committed.' The mode of trial is always under legislative control, subject only to the condition that the Legislature may not, under the guise of establishing modes of procedure and prescribing remedies, violate the accepted principles that protect an accused person against ex post facto enactments. In Hopt v. Utah, 110 U. S. 574, 589 [4 S. Ct. 202] [28 (L. Ed.) 262, 268], a statute that permitted the crime charged to be established by witnesses who by the law at the time the offense was committed were incompetent to testify in any case whatever was adjudged not to be ex post facto within the meaning of the Constitution, the court, observing that such a statute did not increase the punishment nor change the ingredients of the offense nor the ultimate facts necessary to establish guilt, but related 'to modes of procedure only, in which no one can be said to have vested right, and which the state, upon grounds of public policy, may regulate at pleasure.' Hence it has been held that a general statute giving the government more challenges than it had at the time of the commission of a particular offense was constitutional. Walston v. Com., 16 B. Mon. [Ky.] 15, 39."

We think the material inquiry is whether any substantial right of the defendant (appellant) vested in him at the time of the offense, and upon which he had a right to rely, has been violated. It is usually held that a person has no vested right in matters of procedure merely, and so a change in procedure, although possibly to the disadvantage of the accused, is not ex post facto. In a note to People v. Hayes, 37 Am. St. Rep. 572, it is said that: —

"All the courts, state and national, agree that a change in criminal procedure is not to be regarded as altering the situation of an accused to his disadvantage."

This is putting it too strongly, as there are cases holding that a change in procedure may be objectionable, although not within the terms of Mr. Justice Chase's definition, if it operates to deprive accused of any of those substantial rights which may have been vested in him at the time of the offense and upon which he was entitled to rely.

The origin of the grand jury, as we know it today, is very difficult to trace to its exact source. Like many other institutions of modern civilization, it has been an evolution. The following interesting account of the ancient grand jury is given by Mr. Justice Matthews in Hurtado v. People of California, supra:

"And as to the grand jury itself, we learn of its Constitution and functions from the Assize of Clarendon, A. D. 1164, and that of Northampton, A. D. 1176, Stubbs' Charters, 143-150. By the latter of these, which was a republication of the former, it was provided, that 'If any one is accused before the Justice of our Lord the King of murder, or theft, or robbery, or of harboring persons committing those crimes, or of forgery or arson, by the oath of twelve knights of the hundred, or, if there are no knights, by the oath of twelve free and lawful men, and by the oath of four men from each township of the hundred, let him go to the ordeal of water, and, if he fails, let him lose one foot. And at Northampton it was added, for greater strictness of justice (pro rigore justitiae), that he shall lose his right hand at the same time with his foot, and abjure the realm and exile himself from the realm within forty days. And if he is acquitted by the ordeal, let him find pledges and remain in the kingdom, unless he is accused of murder or other base felony by the body of the country and the lawful knights of the country; but

if he is so accused as aforesaid, although he is acquitted
by the ordeal of water, nevertheless he must leave the
kingdom in forty days and take his chattels with him,
subject to the rights of his lords, and he must abjure the
kingdom at the mercy of our Lord the King.' 'The sys-
tem thus established,' says Mr. Justice Stephens (1 Hist.
Crim. Law of England, 252) 'is simple.   The body of the
country are the accusers.   Their accusation is practically
equivalent to a conviction, subject to the chance of a favor-
able termination of the ordeal by water.   If the ordeal
fails, the accused person loses his foot and his hand.   If
it succeeds he is, nevertheless to be banished.   Accusation,
therefore, was equivalent to banishment, at least.'   When
we add to this that the primitive grand jury heard no
witness in support of the truth of the charges to be pre-
ferred, but presented upon their own knowledge, or in-
dicted upon common fame and general suspicion, we shall
be ready to acknowledge that it is better not to go too
far back into antiquity for the best securities for our 'an-
cient liberties.'   It is more consonant to the true philosophy
of our historical legal institutions to say that the spirit
of personal liberty and individual right, which they em-
bodied, was preserved and developed by a progressive
growth and wise adaptation to new circumstances and situ-
ations of the forms and processes found fit to give, from
time to time, new expression and greater effect to modern
ideas of self-government.

"This flexibility and capacity for growth and adapta-
tion is the peculiar boast and excellence of the common
law."

Later, it came about that no grand juror could also
act as trial juror in the same case if objected to by the
accused.   Still later it became the practice for "the
court directly to authorize the sheriff of each county
to return the name of 24 or more persons, from whom
the grand jury is chosen, which number gradually set-
tled to 23, a majority of whom must consent in order to
frame a valid indictment.   Whence it became the cus-
tom that however many attend, or actually officiate,
12 at least must concur in presenting an offender." See
volume 54, Central Law Journal, p. 211, quoting an
article from the Canadian Law Review.

While through the historical accounts the number 12
seems to have been highly esteemed, there seems no sat-
isfactory reason for it except that, in the case of a
grand jury of 23, 12 constituted a majority.   The ma-
jority was the essential thing.   In 4 Blackstone, 302, it
is said:

"As many as appear upon this panel are sworn upon the grand jury to the amount of 12 at the least, and not more than 23; that 12 may be a majority."

It is true that if the number be reduced below 23 by challenge or otherwise, the 12 would be more than a majority of those participating, yet the offender was always subject to be indicted by a bare majority of 23.

Ever since 1865 and until the adoption of our constitutional amendment, our grand jury was composed of 21 persons and 12 must concur in finding an indictment. The amendment provides that:

"A grand jury shall be composed of such number, not less than twelve, as may be prescribed by law. * * * Concurrence necessary for the finding of an indictment by a grand jury shall be prescribed by law; provided, such concurrence shall never be by less than a **majority of those who compose a grand jury,** and, provided, at least eight must concur in finding an indictment when a grand jury is composed of twelve in number. Until otherwise prescribed by law a grand jury shall be composed of twelve in number of which eight must concur in finding an indictment." See Laws 1923, p. 351.

This seems to be the most that the accused was guaranteed, although in some instances the percentage required to concur might be greater than a majority, that is, it was always possible for him to be indicted by a majority of 23.

The case of Hallock v. United States (C. C. A. 8th Circuit) 185 F. 417, is a leading case and is authority for the proposition that the right to be indicted by a grand jury, as given by our Constitution, does not relate to any particular number, and that the qualifications, impanelling, and the precise number of the grand jurors are purely procedural matters and subject to change by the same law-making body which prescribes such qualifications, number, and procedural requirements. In that case the court considered the Kring Case and held it inapplicable. The court said:

"But as was held in Gibson v. Mississippi, 162 U. S. 565, 590, 16 S. Ct. 904, 40 L. Ed. 1075, the inhibition upon the passage of ex post facto laws does not give a criminal a right to be tried in all respects by the law in force when the crime charged was committed. The mode of

trial is always under legislative control, subject only to the
condition that the Legislature may not, under the guise
of establishing modes of procedure and prescribing reme-
dies, violate the accepted principles that protect an ac-
cused person against ex post facto enactments. For ex-
ample the constitutional prohibition against ex post facto
laws has been held not to apply to state laws which
authorize an appeal by the state to the Supreme Court of
the state from a decision of an inferior appellate court in
favor of a defendant (Mallett v. North Carolina, 181 U.
S. 589, 21 S. Ct. 730, 45 L. Ed. 1015); which make com-
petent evidence of a disputed writing not competent be-
fore (Thompson v. Missouri, 171 U. S. 380, 18 S. Ct. 922,
43 L. Ed. 204); which enlarge the class of persons com-
petent to testify in criminal cases (Hoyt v. Utah, 110 U.
S. 574. 4 S. Ct. 202, 28 L. Ed. 262); prescribing additional
qualifications for jury service (Gibson v. Mississippi, 162
U. S. 565, 16 S. Ct. 904, 40 L. Ed. 1075); making a change
in the organization of the Supreme Court of a state so
that instead of a hearing before a full court of five Justices
the hearing is before a division of the court composed of
three out of seven Justices (Duncan v. Missouri, 152 U. S.
377, 14 S. Ct. 570, 38 L. Ed. 485); changing the place of
trial from one county to another in the same district or to
another district (Gut v. State, 9 Wall. 35, 19 L. Ed. 573);
changing the manner of summoning and making up the
jury (Perry v. Commonwealth, 3 Grat. [Va.] 632); giving
the government a right of peremptory challenge of jurors
it did not have when the crime was committed (Walston
v. Commonwealth, 16 B. Mon. [Ky.] 15; State v. Ryan,
13 Minn. 370 [Gil. 343]); reducing the number of peremp-
tory challenges allowed defendants in trials of felonies, not
capital (South v. State, 86 Ala. 617, 6 So. 52); reducing
the number of grand jurors (State v. Ah Jim, 9 Mont.
167, 23 P. 76); preventing a defendant from taking ad-
vantage of variances in an indictment which are not prej-
udicial to him (Commonwealth v. Hall, 97 Mass. 570);
authorizing an appellate court on writ of error to render
such judgment as should have been rendered (Jacquis v.
Commonwealth, 9 Cush. [Mass.] 279); making the court
the judge of the law, whereas before the jury were (Mar-
ion v. State, 20 Neb. 233, 29 N. W. 911, 57 Am. Rep. 825);
depriving a defendant of a right of change of venue from
an examing magistrate (People v. McDonald, 5 Wyo. 526,
42 P. 15, 29 L. R. A. 834); changing practice from indict-
ment to information (Lybarger v. State, 2 Wash. 552, 27 P.
449 1029; State v. Hoyt, 4 Wash. 818, 30 P. 1060); the
substitution of information for indictment under the au-
thority of the state Constitution (In re Wright, 3 Wyo. 478
27 P. 565, 13 L. R. A. 478, 31 Am. St. Rep. 94; People v.
Campbell, 59 Cal. 243, 43, Am. Rep. 257).    In the last
case the court said:

" 'It is not uncommon practice to change the number
of grand jurors required to investigate criminal charges,
but we have never heard of the right of the Legislature

to make such changes questioned, neither has it ever been claimed that the charge, must be investigated by the precise number of grand jurors of which that body was composed, at the time the act was committed.'

"In the case at bar the accused was by the Fifth Amendment exempt from accusation except by presentment or indictment of a grand jury, but the amendment went no further in terms, and if the accused had any constitutional right as to the number of grand jurors, which we need not determine, it was that there should be not less than 12 nor more than 23 as at common law. That right was accorded him in a grand jury of 19. True, a maximum of 16 was prescribed by the statute of Oklahoma Territory, but there was no constitutional quality in that particular number. It was purely statutory. As was said in Matters of Moran, 203 U. .S 97 27 S. Ct. 26 (51 L Ed. 105):

" 'The fifth amendment, requiring the presentment or indictment of a grand jury, does not take up unto itself the local law as to how the grand jury should be made up and raise the latter to a constitutional requirement.'

"The details of qualification and impanelling and the precise number between 12 and 23 are matters with which the amendment is not concerned. They belong to procedure, and are left to legislative discretion. They are not inherently of substantive right within the tests of ex post facto laws above enumerated. Indeed, as already noted, it has been held that, in the absence of a constitutional requirement of indictment, a Legislature may do away with it, and substitute information for offense previously committed. How. less intrinsically important is the mere number of grand jurors! An indictment is not a trial for crime. It is merely a form of public accusation upon which a trial may afterwards be had. Historical research into the origin of the procedure shows that the important thing was not the particular number of persons who participated in the investigation or who made the charge of their own knowledge as in a presentment, but that it should be under official or public sanction so that one might not be put to the ordeal upon mere private accusal.

"It is urged that prejudice resulted from an increase of the maximum number of grand jurors, 16, under the statute of the territory, to 19, because out of the greater number it was easier to secure the concurrence of 12 to an indictment. We think the prejudice more imaginary than real. . At the common law there was a range from 12 to 23, and, if the practice under that law was in contemplation at the adoption of the Fifth Amendment, it is apparent that the greater or less number between the limits was regarded as of such minor importance that it was left to the discretion of the courts. Even under the Act of Congress, any circuit or district court impaneling a grand jury may determine whether there shall be 16 or 23 members or any number between, and it is common for a

grand jury in one of those courts to vary in the number
of attendant jurors during a single term of court. Safe-
guards of life and liberty regarded as substantial and im-
portant are not usually left in such an indeterminate con-
dition.''

In State v. Kyle, 166 Mo. 287, 65 S. W. 763, 56 L. R.
A. 115, the court decided that the amendment to the
Constitution of Missouri making an indictment and in-
formation concurrent remedies in prosecutions for fel-
onies, whereas prior thereto a felony could not be prose-
cuted otherwise than by indictment ''except in cases
arising in the land and naval forces, or in the militia
when in actual service in time of war or public dan-
ger,'' was not an ex post facto law. The court relied
upon the definition given in Calder v. Bull, supra, and
said:

''Under this definition of an ex post facto law, the
amendment, although providing for another mode of pro-
cedure for the prosecution of felonies than by indictment
does not fall within the meaning of an ex post facto law
as thus defined, for it does not make an action done be-
fore its adoption criminal, nor does it aggravate the crime,
or in any way affect it, nor change the punishment nor
alter the legal rule of evidence, but, as has been said, goes
merely to the mode of procedure. The mode of investiga-
ting the facts remain as before, and this through a trial
by a jury of defendant's own choosing, surrounded by
certain safeguards guaranteed to him by the laws of the
land, which cannot be dispensed with. * * *

''In re Wright, 3 Wyo. 478 [27 P. 565, 13 L. R. A.
748, 31 Am. St. Rep. 94], it was ruled that a law changing
the mode of procedure from indictment to information in
cases of felonies already committed is not ex post facto, and
does not infringe any substantial right of the offender.
The same rule is announced in State v. Thompson, 141
Mo. 408 [42 S. W. 949]; Duncan v. Missouri, 152 U. S.
377 [14 S. Ct. 570, 38 L. E.. 485].''

Appellant, however, thinks that the better reasoning
is found in the dissenting opinion of Judge Sanborn in
Hallock v. United States, supra. When the defendant
below (in the Hallock case) committed the offense with
which he was charged, he could be tried as the law
then stood only under such an indictment found with
the concurrence of 12 members of a grand jury com-
posed of not less than 12 nor more than 16 persons.
Later statutes authorized an indictment, concurred in

by 12 members of a grand jury composed of not less than 16 nor more than 23. Judge Sanborn says:

"The indictment in this case was found by a jury composed of 19 members. Did this change in the law wrought by the adoption of the Constitution of Oklahoma and the admission of that state into the Union after the commission of the offense and before the trial 'in relation to the offense or its consequences alter the situation of the accused to his advantage?' In my opinion it clearly had that effect (1) because, if the defendant had been indicted under the law as it stood when his offense was committed by a jury of 19 men, he could not have been tried or convicted on that indictment (Harding v. State, 22 Ark. 210), while the new law permitted his conviction upon such an indictment; and (2) because for him to have only 5 dissenting members of the grand jury to defeat the indictment against him, while under the new law it was necessary for him to have 8."

So it is seen that Judge Sanborn attached some importance to mathematical consideration in determining whether the change placed the accused at a disadvantage. So, following his line of argument, we see that under the common-law grand jury of 23 it would have been necessary for the defendant to have 12 dissenting members of the grand jury to defeat the indictment against him, and under our former statutes he would have to secure 10 dissenting members, and under our constitutional amendment at present only 5 dissenting members are required to defeat an indictment. If it be said that there is a smaller number from which to secure the dissenters it will be observed that 5 is a smaller percentage of 12 than 10 is of 21.

On the other hand, whereas under the common-law grand jury of 23 the 12 required to concur is a bare majority of 23, and under our old statutes the concurrence of 12 was just a little more than a majority of 21. The amendment requires a concurrence of two-thirds of 12 to find an indictment, and it is to be noted that the amendment declares that it may be provided by law that the grand jury may present an indictment by a majority of the number of the grand jury, which is the only guaranty that the offender ever had at the common law.

We do not feel that any substantial right of the defendant is impaired by the change in the grand jury system. We think the amendment relates to a procedural matter merely. It is not complained that any error was committed at the trial resulting in his conviction by either the petit jury or court. It is not made to appear how he was placed at any disadvantage by being put on trial by the indictment found upon the concurrence of 8 out of 12, instead of 12 out of 21. It did not change his acts from innocent to criminal; the crime was not augmented, no change was made in the punishment; no change was made in the legal rules of evidence requiring for his conviction less or different testimony than was required at the time of the commission of the offense. We agree with the Circuit Court of Appeals of this circuit that the prejudice, if any, to the defendant resulting from the change is more imaginary than real. We would not wish to sanction the liberation of all those who committed crime prior to January 1, 1925, upon technical grounds without the plainest showing that the change in procedure has altered their situation to their disadvantage and deprived them of a substantial vested right upon which they were entitled to rely. We do not think it has. The judgment is affirmed, and it is so ordered.

PARKER, C. J., and WATSON, J., concur.